# 14-1631-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

THOMAS CANTY, derivatively on behalf of LULULEMON ATHLETICA, INC.,

*Plaintiff-Appellant,*

—against—

CHRISTINE MCCORMICK DAY, DENNIS J. WILSON, JOHN E. CURRIE, SHEREE WATERSON, MARTHA A.M. MORFITT, MICHAEL CASEY, ROBERT BENSOUSSAN, ROANN COSTIN, WILLIAM GLENN, RHODA M. PITCHER, THOMAS G. STEMBERG, JERRY STRITZKE, EMILY WHITE,

*Defendants-Appellees,*

LULULEMON ATHLETICA, INC.,

*Nominal Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

BRETT D. STECKER
JEFFREY J. CIARLANTO
CHRISTOPHER L. NELSON
THE WEISER LAW FIRM, P.C.
22 Cassatt Avenue, First Floor
Berwyn, Pennsylvania 19312
(610) 225-2677

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.................................................................. 1

STATEMENT OF ISSUES ............................................................................ 1

STATEMENT OF THE CASE ........................................................................ 2

STATEMENT OF FACTS .............................................................................. 6

    A.    Lululemon's Business Plan ............................................... 6

    B.    Quality Control Was Key To Executing The Company's Business Plan ..................................................................... 7

    C.    Lululemon's Rapid Growth ............................................. 8

    D.    The Black Luon Recall .................................................... 9

    E.    In a Surprise, Day "Resigns" In The Wake Of The Black Luon Recall ......................................................... 10

    F.    Wilson's And Day's Highly Suspicious Insider Stock Sales ........ 11

    G.    The Delaware Chancery Court, Drawing Reasonable Inferences, Determines That Wilson's June 7th Sale Was Suspicious .................................................................. 13

SUMMARY OF THE ARGUMENT ................................................. 14

ARGUMENT .................................................................................. 15

    A.    Legal Standards ............................................................. 15

        1.    Standard of Appellate Review ........................... 15

        2.    Pleading Standard Under Fed. R. Civ. P. 23.1 .................. 15

        3.    Substantive Standard for Adequately Alleging Demand Futility Under Delaware Law ........................... 16

    B.    The Lower Court Committed Reversible Error By Failing to Find that Plaintiff Had Adequately Alleged Demand Was Futile ........................................................................... 22

i

## <u>TABLE OF CONTENTS</u>
### <u>(continued)</u>

1.    The Lower Court Erred When it Failed to Affirmatively Find That Day And Wilson Are Directly Interested Based On Their Challenged and Suspicious Insider Stock Sales .......................................................................... 22

1.    The Lower Court Erred When It Failed To Find That The Entire Board Was Interested In A Demand Based on Their Conduct In Facilitating Wilson's Illicit June 7th Sale ...................................................................................... 29

CONCLUSION ................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) *overruled by*
   *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ...................................16, 17, 21, 32

*Belova v. Sharp*,
   CV 07-299-MO, 2008 WL 700961 (D. Or. Mar. 13, 2008)...................20, 21, 33

*Beneville v. York*,
   769 A.2d 80 (Del. Ch. 2000) ...............................................................................22

*Chiarella v. U.S.*,
   445 U.S. 222 (1980)..............................................................................................25

*Conrad v. Blank*,
   940 A.2d 28 (Del. Ch. 2007) ........................................................................21, 33

*Dollens v. Zionts*,
   01 C02826, 2002 WL 1632261 (N.D. Ill. July 22, 2002)...................................28

*Edmonds v. Getty*,
   524 F. Supp. 2d 1267 (W.D. Wash. 2007) .............................................21, 31, 33

*Emerald Partners v. Berlin*,
   726 A.2d 1215 (Del. 1999) ..................................................................................19

*Engel v. Sexton*,
   Civ. A. 06-10447, 2009 WL 361108 (E.D. La. Feb. 11, 2009)...................21, 33

*Gomez v. Toledo*,
   446 U.S. 635 (1980)..............................................................................................16

*Grimes v. Donald*,
   673 A.2d 1207 (Del. 1996) ..................................................................................17

*Halebian v. Berv*,
   590 F.3d 195 (2d Cir. 2009) ................................................................................15

*Harris v. Mills*,
   572 F.3d 66 (2d Cir. 2009) ..................................................................................16

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

CASES

*In re Abbott Labs. Derivative S'holders Litig.*,
  325 F.3d 795 (7th Cir. 2003) ...............................................................................20

*In re Adolor Corp. Derivative Litig.*,
  No. 04-3649, 2009 WL 1325738 (E.D. Pa. May 12, 2009) ..............................29

*In re Baxter Int'l, Inc. S'holders Litig.*,
  654 A.2d 1268 (Del. Ch. 1995) ..........................................................................20

*In re China Agritech, Inc. S'holder Derivative Litig.*,
  C.A. No. 7163–VCL, 2013 WL 2181514 (Del. Ch. May 21, 2013)..................17

*In re INFOUSA, Inc. S'holders Litig.*,
  953 A.2d 963 (Del. Ch. 2007). .....................................................................26, 27

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999).........................................................................27

*In re Pfizer, Inc. Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010) ...........................................................16, 21

*In re Questcor Sec. Litig.*,
  No. SA CV 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. 2013)..................26

*In re TASER, Int'l S'holder Derivative Litig.*,
  CV-05-123-PHX-SRB, 2006 WL 687033
  (D. Ariz. Mar. 17, 2006) .................................................................20, 23, 27, 29

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009)................................................................26

*In re Veeco Instruments, Inc. Sec. Litig*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006) ......................................................16, 17, 21

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
  No. Civ. A. 14995, 1997 WL 208955 (Del. Ch. Apr. 22, 1997).......................20

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

CASES

*Kamen v. Kemper Fin. Servs.*,
500 U.S. 90 (1991) .......................................................................15, 16

*Kaplan v. Centex Corp.*,
284 A.2d 119 (Del. Ch. 1971) ...........................................................32

*Oberly v. Kirby*,
592 A.2d 445 (Del. 1991) ...................................................................19

*Pfeiffer v. Toll*,
989 A.2d 683 (Del. Ch. 2010) .....................................................*passim*

*Rales v. Blasband*,
634 A.2d 927 (Del. 1993) ...........................................................*passim*

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ................................................................27

*Ryan v. Gifford*,
918 A.2d 341 (Del. Ch. 2007) ..............................................20, 21, 33

*Scalisi v. Fund Asset Mgmt., L.P.*,
380 F.3d 133 (2d Cir. 2004) ...............................................................15

*S.E.C. v. Obus*,
693 F.3d 276 (2d Cir. 2012) ...............................................................25

*Weiss v. Swanson*,
948 A.2d 433 (Del. Ch. 2008) ....................................................21, 33

*Zimmerman v. Braddock*,
Civ. A. 18473-NC, 2005 WL 2266566 (Del. Ch. Sept. 8, 2005),
*rev'd on other grounds*, 906 A.2d 776 (Del. 2006) ....................*passim*

STATUTES

8 Del. C. § 102(b)(7) ...................................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

STATUTES

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1331 ................................................................................1

28 U.S.C. § 1367(a) ...........................................................................1

Fed. R. Civ. P. 23.1 ...................................................................1, 15, 16

Fed. R. App. P. 3(a) ...........................................................................1

Fed. R. App. P. 4(a) ...........................................................................1

## STATEMENT OF JURISDICTION

The United States District Court for the Southern District of New York (the "Lower Court") had subject matter jurisdiction over this shareholder derivative action (the "Action") pursuant to 28 U.S.C. § 1331 because it states a federal question. The Lower Court had supplemental jurisdiction over the Delaware state law claims asserted in this Action pursuant to 28 U.S.C. § 1367(a). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because the appeal is from a final judgment that disposes of all claims with respect to the parties. Pursuant to FRAP (3)(a) and 4(a), Plaintiff-Appellant Thomas Canty ("Plaintiff") timely filed his notice of appeal on May 9, 2014. A-465.[1]

## STATEMENT OF ISSUES

The central issue presented on appeal is whether the Lower Court committed reversible error when it dismissed Plaintiff's Verified Amended Shareholder Derivative Complaint (the "Complaint"), asserted on behalf of nominal party lululemon athletica, inc. ("Lululemon" or the "Company") for failure to adequately allege that the pre-suit demand requirement pursuant to Fed. R. Civ. P. 23.1 was excused as futile.[2] This issue involves the following sub-issues:

---

[1] "A-" refers to the cited pages in the Joint Appendix filed concurrently herewith. All citations appear in the form: "A-___."

[2] Plaintiff appeals from the Lower Court's Opinion and Order dated April 9, 2014 (the "Order") and the Clerk's Judgment dated April 25, 2014. A-402-454.

1

1)  Whether the Lower Court committed reversible error when it failed to accord to Plaintiff the benefit of all reasonable inferences at the pleading stage.

2)  Whether the Lower Court committed reversible error when it failed to find that defendants[3] Wilson and Day are directly interested in a demand due to their illicit insider stock sales.

3)  Whether the Lower Court committed reversible error when it found that Plaintiff failed to allege that a majority of the members of Lululemon's Board of Directors (the "Board") were interested in a demand based on a substantial likelihood of liability in connection with, *inter alia*, defendant Wilson's highly suspicious, challenged June 7, 2013 insider stock sale (the "June 7th Sale").

## STATEMENT OF THE CASE

The entire Board, but not the public, was directly informed on Friday, June 7, 2013 that defendant Day, Lululemon's longtime Chief Executive Officer ("CEO"), had resigned.  A-37.  That very same day, armed with this material, non-

---

[3] "Defendants" include the following current and/or former directors and officers of Lululemon: Christine McCormick Day ("Day"), Dennis J. Wilson ("Wilson"), John E. Currie ("Currie"), Sheree Waterson ("Waterson"), Martha A.M. Morfitt ("Morfitt"), Michael Casey ("Casey"), Robert Bensoussan ("Bensoussan"), Roann Costin ("Costin"), William Glenn ("Glenn"), Rhoda M. Pitcher ("Pitcher"), Thomas G. Stemberg ("Stemberg"), Jerry Stritzke ("Stritzke"), and Emily White ("White").  A-46.  The "Director Defendants" include the following defendants: Day, Wilson, Bensoussan, Casey, Costin, Glenn, Morfitt, Pitcher, Stemberg, Stritzke, and White.  A-106.

2

public, adverse information,[4] defendant Wilson executed the June 7th Sale, the largest single-day stock sale he had ever made, for proceeds totaling almost **$50 million**. A-38. The Board chose not to publicly disclose Day's abrupt and surprising resignation, however, until the close of trading on Monday June 10, 2013, which immediately caused Lululemon's stock price to plummet (of course, well after Wilson's June 7th Sale had been completed, to his great personal financial benefit).[5] A-37-38. And when the financial media, including the *WSJ,* publicly called into question the propriety of Wilson's massive, seemingly exquisitely-timed June 7th Sale and the belated timing of the announcement of Day's resignation, the Board took no action whatsoever. Stated simply, this was and is a classic insider trading scheme, which should have rendered any demand upon the entire Board as being futile.

Despite this incredibly simple, highly suspicious set of particularized facts implicating Wilson and the rest of the Board, the Lower Court dismissed Plaintiff's Complaint for failing to adequately allege that a demand upon the Board was

---

[4] During Day's tenure as Lululemon's CEO, the Company's annual revenues and gross profits quadrupled, its number of stores increased by more than double, and its stock price skyrocketed from approximately $4 per share to $70 per share. A-39.

[5] Notably, as the *Wall Street Journal* (the "*WSJ*") subsequently reported, Lululemon's stock promptly fell by more than **17%** on Tuesday, June 11, 2013, to $67.85 per share on the surprising news of Day's resignation. A-40. As the *WSJ* observed, "[a] sale at that price would have brought Mr. Wilson about **$8 million less** than he reaped by selling his stock the previous week." *Id.*

futile. The Lower Court's reversible error in failing to find that a demand was futile as to a majority of the Board in connection with the June 7th Sale was only underscored by a ruling issued shortly before the Lower Court's ruling by Vice Chancellor Donald F. Parsons, Jr. ("Vice Chancellor Parsons") of the Delaware Court of Chancery, in a related action captioned *Laborers' District Council Construction Industry Pension Fund v. Lululemon Athletica Inc.*, Civil Action No. 9039-VCP (the "Delaware Action"). A-355.

In particular, with regards to the June 7th Sale, Vice Chancellor Parsons concluded that "***the June 7 stock sale is sufficiently suspect as to provide a credible basis for inferring possible wrongdoing***…" A-379. Indeed, Vice Chancellor Parsons held that Wilson's "unusually large" June 7th Sale, executed "on the same day that he learned of material, nonpublic information that would more likely than not diminish significantly the Company's stock price, raises legitimate questions as to the propriety of that particular sale." A-381. The Lower Court erred because it inexplicably did not accord to Plaintiff the same reasonable inferences that Vice Chancellor Parsons drew based on the same facts.

In that same vein, in addition to finding a "credible basis for inferring possible wrongdoing" by defendant Wilson in connection with his June 7th Sale, Vice Chancellor Parsons reasonably inferred that the other members of Lululemon's Board may have breached their fiduciary duties. Specifically, Vice

Chancellor Parsons held that "[b]ased on the nature of the June 7th trade and the absence of any evidence of public statements or other indications that the Company's board examined the trade or Wilson's conduct, [there is] a credible basis for inferring that the Company's board may have mismanaged this situation, in terms of monitoring." A-383-384.

The Lower Court was undoubtedly aware of Vice Chancellor Parsons' ruling in the Delaware Action at the time the Order was issued. Indeed, the plaintiffs in the Delaware Action submitted a letter to the Lower Court attaching the transcript setting forth Vice Chancellor Parsons' ruling. A-352-353. The Lower Court nonetheless disregarded Vice Chancellor Parsons' conclusions and reasonable inferences drawn based on the facts, and instead erroneously found that "Plaintiffs fail to plead particularized allegations as to the disinterestedness or independence of any of the Director Defendants as it relates to Wilson and his June 2013 trading." A-446.

A Delaware Vice Chancellor, applying Delaware law, reasonably inferred that Wilson and the entire Board may have breached their fiduciary duties and/or otherwise engaged in wrongdoing with respect to the massive, "sufficiently suspect" June 7th Sale. The Lower Court impermissibly failed to give Plaintiff the benefit of the same reasonable inferences based on the same facts, even though Plaintiff was and is entitled to the benefit of all reasonable inferences at the

pleading stage, and its issuance of the Order was therefore erroneous.[6] Accordingly, for the reasons discussed more fully herein, Plaintiff respectfully requests that this Court reverse the Lower Court's Order and remand this Action consistent with this Court's ruling.

## STATEMENT OF FACTS[7]

### A. Lululemon's Business Plan

Lululemon designs and sells premium athletic apparel and accessories, including yoga pants, shorts, and tops. A-184. Lululemon's business model is based on selling garments at high prices (approximately $100 per pair of pants and $60 per shirt) based upon their purported high quality, offering minimal discounts, and keeping only a very small inventory of products in its stores to drive demand. *Id.* Indeed, in Lululemon's Form 10-K for fiscal year 2012, filed with the SEC on March 21, 2013, Defendants claimed that what purportedly "differentiates" Lululemon from competitors and drives its "competitive strength" is that it offers "superior" and "high-quality premium apparel that is designed for performance, comfort, functionality and style." *Id.* As defendant Day stated publicly on

---

[6] As discussed herein, the Lower Court also erred when it failed to find that defendant Day was also directly interested in a demand based on her participation in illicit insider trading.

[7] In the interests of brevity, Plaintiff only highlights the most critical facts in this section. For a more fulsome discussion of the factual background, Plaintiff respectfully refers the Court to Plaintiff's Complaint and relevant motion to dismiss briefing.

September 7, 2012, "[i]n the end, quality is our key differentiating factor. It is what [Lululemon] stands for and what [Lululemon] will always stand behind." *Id.*

Lululemon's most important and popular products are women's fitness pants designed from a proprietary material known as "Luon." *Id.* Before the start of the Relevant Period, black-colored Luon pants alone accounted for at least 17% of Lululemon's overall sales of women's pants, and 6% of Lululemon's total sales – or $80 million during 2012. *Id.* Black Luon pants also have one of the highest profit margins of any of Lululemon's products, and sales of these pants often result in "add-on" sales of other Lululemon products. *Id.* Luon is not manufactured by Lululemon itself. *Id.* Rather, Lululemon contracts with manufacturers for the production of all of its products, and its Luon-based garments have for the past ten years been produced by Eclat Textile Co., Ltd. ("Eclat"), a company based in Taiwan. A-184-185.

## B.   Quality Control Was Key To Executing The Company's Business Plan

In light of Lululemon's business plan, maintaining high product quality at all times was and is essential to the Company's ability to maintain the value and reputation of its brand. A-185. Defendants specifically acknowledged that "maintaining, promoting and positioning its brand" depended largely on the Company's ability "to provide a consistent, high quality guest experience." *Id.* As

such, any "negative publicity regarding the production methods of any of [its] suppliers or manufacturers could adversely affect [its] reputation and sales." *Id.*

Given the critical role that core products manufactured with Luon fabric played in Lululemon's rapid growth and financial success, maintaining high-quality Luon products is especially important to its business, and Defendants repeatedly acknowledged this. *Id.* For example, Day claimed publicly that "Luon has been the same for over 7 years," that the Company was purportedly "maniacal about protecting that standard," and that Lululemon "monitor[s] the quality and feedback on [its Luon] items in particular." *Id.*

## C.    Lululemon's Rapid Growth

Over the last several years, during Day's tenure as CEO, the Company's apparel sales led to enormous growth. *Id.* In just a few short years, from 2009 to 2012, Lululemon quadrupled annual revenues to $1.37 billion, quadrupled gross profits to $763 million, and more than doubled its number of stores to over 200. *Id.* In 2012, Lululemon ranked third in North America in sales per square feet, behind only Apple and Tiffany & Co. *Id.* Fueled by strong financial results, Lululemon's stock price increased dramatically, from approximately $4 at the beginning of 2009 to approximately $70 at the end of 2012. *Id.* Black-colored Luon products, a significant driver of sales, contributed substantially to this success. *Id.*

8

### D.    <u>The Black Luon Recall</u>

Starting in February and March 2013, the Company's most severe and damaging quality control disaster in its history came to light, which involved core products manufactured with Luon fabric. A-187. Specifically, customers began reporting that certain bright-colored Luon pant fabrics were sheer when worn. A-186. In order to avoid flagging yet another serious quality control issue, rather than immediately conduct a recall, at Defendants' direction, the products were instead put on sale and offered with a disclaimer as to "sheerness." *Id.*

The problems with Lululemon's signature Luon fabric were so severe, however, that they could not be rectified by this disclaimer, and, ultimately, Defendants' failure to take affirmative steps to implement fundamental quality controls led to the most serious quality control disaster in Lululemon's history. *Id.* Following the close of trading on March 18, 2013, Defendants announced in a press release that Lululemon's highly popular black Luon pants not only failed to meet basic quality requirements, but were so sheer that they were see-through, offering little more coverage than pantyhose. *Id.* As a result of these defects, the pants were unsaleable, and the Company was forced to recall and offer refunds for all of the affected products – totaling hundreds of thousands of pairs of pants – and to significantly reduce its expected revenue guidance for the first quarter of 2013 by approximately $20 million, or 5%, from $350-$355 million to $333-$343

9

million.  *Id.*  As Defendants announced three days later, Lululemon expected to lose $57-$67 million in revenue and $0.25-$0.27 in earnings per share ("EPS") during the 2013 fiscal year due to the Black Luon Recall, a negative 12% impact on Defendants' previously-issued 2013 EPS guidance.  *Id.*

As Defendants ultimately were forced to admit (after their initial, ill-conceived ploy to publicly blame Eclat), the Black Luon Recall occurred because, contrary to Defendants' public statements touting the strength of Lululemon's quality controls, under Defendants' direction and on their watch, even the most basic and rudimentary of all quality control measures used by other retailers were never employed.  A-188.  Incredibly, among other things, Defendants failed to ensure that samples of Lululemon's clothing were tried on before they were shipped.  *Id.*

**E.    In a Surprise, Day "Resigns" In The Wake Of The Black Luon Recall**

On June 10, 2013, at the close of trading, Day's abrupt and unexpected "resignation" from the Company was announced in an earnings press release.  *Id.* When questioned by *Fortune* regarding the reasons for and circumstances of her "mysterious departure," Day cryptically said, "[m]y values include discretion" (a curious statement, to say the least, considering that Day been CEO of a public company for years), and refused to comment further.  *Id.*  Numerous media reports tied Day's departure to the recent Black Luon Recall scandal.  *Id.*  Analysts, such

as those from RBC Capital Markets, "assume[d Defendant Day's] pending departure [wa]s in some way related to the sheer pant issue," notwithstanding Day's and the Board's silence on the subject, because her departure was "just too close to [the Black Luon Recall] issue to remove it from the reason why she's leaving." *Id.*  Many industry observers agreed with that assessment. *Id.*

**F.    <u>Wilson's And Day's Highly Suspicious Insider Stock Sales</u>**

Uncontested by Defendants in the Lower Court are Plaintiff's particularized allegations that defendants Wilson and Day executed massive, illicit insider stock sales, which are suspicious both respect to their timing and the amounts.  A-190.  Indeed, over a six month span during the Relevant Period, Wilson sold almost 2.3 million Lululemon shares for proceeds totaling over $184 million.  *Id.*

Defendant Wilson's June 7th Sale was particularly suspicious, as the financial media and many other market observers have pointed out, and critically, as the Delaware Chancery Court determined as well.  Based on the timing of the June 10, 2013 disclosure that Day was resigning as CEO – a fact that Wilson and all of his fellow Board members ***were directly informed of*** no later than June 7, 2013 – the value of Wilson's trades was maximized.  Specifically, as discussed above, on June 7, 2013, the full Board was formally informed that Day would "resign" as CEO.  *Id.*  That same day, Wilson sold 607,545 Lululemon shares for proceeds totaling nearly $50 million.  *Id.*  Three days later, at the close of trading

11

on June 10, 2013, Day's "resignation" was revealed as part of an earnings press release. *Id.* Between June 4 and June 7, 2013, all told, Wilson sold 1 million shares for proceeds totaling $81 million at prices near Lululemon's all-time stock price high. *Id.* Lululemon's stock promptly fell by 22% following the stunning news that Day resigned. *Id.*

Wilson's trades were also suspicious in their amounts: his June 7th Sale was the largest single day sale that Wilson had ***ever made***; his June 4, 2013 and June 7, 2013 sales represented more than half of all of his sales in the Relevant Period; and as of the time that the Complaint was filed, Wilson had executed no stock sales whatsoever since June 7, 2013. A-190-191.

Moreover, during the Relevant Period, defendant Day sold 196,043 shares of Lululemon stock for over $14 million in illicit proceeds. A-191. Day's sales challenged in the Complaint were highly suspicious based on their timing. *Id.* Critically, Day sold over $6 million worth of Lululemon stock in September 2012, just days after she personally issued false and materially misleading statements in which she claimed, *inter alia,* that the Company's quality assurance problems had been corrected. *Id.* Lululemon's stock price shot up by approximately 12.5% immediately following her positive, false statements. *Id.* Indeed, as demonstrated in the Complaint, this was a consistent pattern for Day, who similarly capitalized on other Lululemon stock price "spikes" immediately following the issuance of her

own positive yet false and materially misleading statements in December 2012 and September 2013. *Id.*

## G. The Delaware Chancery Court, Drawing Reasonable Inferences, Determines That Wilson's June 7th Sale Was Suspicious

As discussed above, in a related action before the Delaware Chancery Court, Vice Chancellor Parsons concluded that based on the facts and circumstances surrounding the June 7th Sale there is at least a "credible basis" for inferring wrongdoing on the part of defendant Wilson. Vice Chancellor Parsons specifically determined that "the June 7 stock sale is sufficiently suspect as to provide a credible basis for inferring possible wrongdoing…" A-379. Vice Chancellor Parsons further held that Wilson's June 7th Sale is suspicious because, *inter alia,* "the sale took place on the same day that the Company's CEO notified the board of her resignation, and that information was available only to a small group of company insiders." A-380. Additionally, Vice Chancellor Parsons found the sale to be suspicious because "Wilson sold significantly more shares on June 7th than he had on any single day in the previous three years." *Id.* In sum, Vice Chancellor Parsons held that Wilson's "unusually large" June 7th Sale, executed "on the same day that he learned of material, nonpublic information that would more likely than not diminish significantly the Company's stock price, raises legitimate questions as to the propriety of that particular sale." A-381. But Vice Chancellor Parsons, critically, did not stop there. Vice Chancellor Parsons also found that it was

13

reasonable to infer that the rest of the members of the Board may be liable for breaching their fiduciary duties in connection with defendant Wilson's June 7th Sale. Based on "the unusual timing and circumstances of Wilson's June 7 sale," Vice Chancellor Parsons held that there was a "credible basis for inferring that the company's board may have mismanaged this situation, in terms of monitoring." *Id.*

## SUMMARY OF THE ARGUMENT

The Lower Court's Order should be reversed on the following grounds:

1.     Demand is futile as to defendants Day and Wilson because they both engaged in illicit insider selling as challenged in the Complaint. Before the Lower Court issued its Order, Vice Chancellor Parsons of the Delaware Chancery Court had already held based on substantially the same facts that there was a "credible basis to infer wrongdoing" in connection with Wilson's June 7th Sale. A-379. In the alternative, demand is also excused with respect to defendants Wilson and Day due to the fact that at the time the Action was initiated, their principal professional occupations were their executive roles at the Company, and therefore there is reason to doubt their independence.

2.     Demand is futile as to all of the Director Defendants in light of their actions and/or conscious inactions both before and after defendant Wilson's June 7th Sale. In particular, the Director Defendants allowed defendant Wilson to make

14

his June 7th Sale even though they knew, but the public did not, that defendant Day had resigned and the announcement of her resignation would not occur until June 10, 2013, and failed to take any action whatsoever.

## ARGUMENT

### A.    Legal Standards

#### 1.    Standard of Appellate Review

A motion to dismiss for failure to plead demand futility tests only the legal sufficiency of the plaintiff's allegations.   Appellate review of a district court's decision to dismiss, therefore, is *de novo*.  *Scalisi v. Fund Asset Mgmt., L.P.,* 380 F.3d 133, 137 (2d Cir. 2004) ("When a trial court rules on the legal sufficiency of a complaint the question presented should be one of law.   When an appellate court reviews such a ruling, review should be *de novo*"); *Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009) (same).

#### 2.    Pleading Standard Under Fed. R. Civ. P. 23.1

A shareholder derivative action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers and directors.  *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991).  Pursuant to Fed. R. Civ. P. 23.1, a derivative plaintiff must allege either: (a) that he has made a pre-suit demand on the corporation's board of directors to take the requested action; or (b) the reasons for not making demand, *i.e.*, the reasons why demand is futile.  In considering a

Rule 23.1 motion to dismiss, a federal court must accept as true all allegations in the complaint, view them in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Gomez v. Toledo*, 446 U.S. 635, 636 n.3 (1980). *See also Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (court takes all factual allegations to be true and draws all reasonable inferences in the plaintiff's favor); *In re Pfizer, Inc. Derivative Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010) (same); *In re Veeco Instruments, Inc. Sec. Litig*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (same). The Court must read all of the plaintiff's allegations as a whole, not relying on any one factor or factors in isolation. *Veeco*, 434 F. Supp. 2d at 274.

### 3.    Substantive Standard for Adequately Alleging Demand Futility Under Delaware Law

Because Lululemon is a Delaware corporation, Delaware law controls the substantive demand futility analysis. *Kamen*, 500 U.S. at 108-09. Under Delaware law, a pre-suit demand on a board of directors is not required if the facts pled show that such a demand would have been futile. *Aronson v. Lewis*, 473 A.2d 805, 807 (Del. 1984) *overruled by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

A plaintiff is excused from making a pre-suit demand if there is reason to doubt that: (i) a majority of a board's directors are independent or disinterested; or (ii) the challenged acts are a valid exercise of business judgment. *Id.* at 812; *see also Pfizer*, 722 F. Supp. 2d at 458 (applying Delaware law). To implicate the

16

*Aronson* test, a plaintiff must challenge a board decision where its members exercised business judgment.  *Aronson*, 473 A.2d at 812; *see also Veeco*, 434 F. Supp. 2d at 274 (applying Delaware law).

Where a complaint does not challenge a specific action or decision of the board, demand is excused where the complaint raises a reasonable doubt that a majority of the directors are disinterested or independent.  *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993).  This reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here], the claim is not based on mere suspicions or stated solely in conclusory terms."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996).

"Reasonable doubt," as applied by Delaware courts, means "reason to doubt" that a board is capable of making an independent or disinterested decision.  *Id.*  Thus, plaintiff only needs to allege with particularity facts that would give a reasonable shareholder reason to doubt the directors' ability to consider a demand disinterestedly.[8]  *Id.*  This is particularly appropriate in derivative suits, because plaintiffs typically have not had the benefit of discovery.  *Rales,* 634 A.2d at 934

---

[8] In their simplest terms, both the *Aronson* and *Rales* tests ask whether the "directors are incapable of making an impartial decision regarding such litigation." *Rales*, 634 A.2d at 932.  As the Delaware Chancery Court recently noted, the *Aronson* and *Rales* tests are "complementary versions of the same inquiry."  *In re China Agritech, Inc. S'holder Derivative Litig.*, C.A. No. 7163–VCL, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013).

(requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").

Under Delaware law, a particular director is disqualified from considering a demand where there is a reasonable doubt that he or she is either "interested" or lacks "independence" from a director who is so interested. *Id.* at 935-37. As stated by the Delaware Supreme Court:

> ***A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision***.

*Id.* at 936.

In order to adequately allege that a director is directly "interested" in a demand based on their insider stock sales, a plaintiff need only plead facts supporting the inference that directors "possessed material, nonpublic company information" and "used that information improperly by making trades because [they were] motivated, in whole or in part, by the substance of that information." *See Pfeiffer v. Toll,* 989 A.2d 683, 691 (Del. Ch. 2010). A complaint that alleges "***directly and by imputation***" that directors knew of the material information and made trades on that basis satisfies this standard. *Zimmerman v. Braddock*, Civ. A.

18

18473-NC, 2005 WL 2266566, at *8 (Del. Ch. Sept. 8, 2005), *rev'd on other grounds*, 906 A.2d 776 (Del. 2006).  To support such knowledge by imputation, the plaintiff need only plead facts from which it can ***reasonably be inferred*** that the information was "knowable" and that the directors were in a position to know it.  *See Pfeiffer*, 989 A.2d at 694 (plaintiffs' allegations of insider trading by directors were sufficient where plaintiffs "allege[d] that the defendants possessed material information about critical metrics that undercut the [defendants'] projection and indicated that it could not be achieved").[9]

Stated another way, under Delaware law, directors are directly "interested" based on insider stock sales where, when drawing all reasonable factual inferences

---

[9] As Vice-Chancellor Laster stated in *Pfeiffer,* insider sales made by directors of a Delaware corporation based on material, adverse, non-public information constitute ***non-exculpable*** breaches of fiduciary duties of loyalty and good faith.  It is well-settled that under 8 Del. C. § 102(b)(7) ("Section 102(b)(7)"), a Delaware corporation may not exempt its directors from liability for violations of the duties of loyalty and good faith.  *Emerald Partners v. Berlin*, 726 A.2d 1215, 1225-27 (Del. 1999).  Accordingly, Section 102(b)(7) will support a motion to dismiss only where the sole conceivable basis of liability is a violation of the duty of care.  *Id.* As Vice-Chancellor Laster held in *Pfeiffer*, the decision to sell stock based on the possession of material, adverse, non-public information is a disloyal, bad faith act. *Pfeiffer*, 989 A.2d at 707; *see also Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship…."). Accordingly, the Lower Court's reliance on Section 102(b)(7) and the exculpatory provision contained in Lululemon's Articles of Incorporation was and is clearly erroneous and in itself serves as an independent and distinct basis upon which the Order should be reversed.  A-425.  Plaintiff did not allege "due care" claims – rather, he alleged claims based on violations of the duties of good faith and loyalty.

in favor of the plaintiffs, their challenged trades simply appear **suspicious**.  *See Zimmerman,* 2005 WL 2266566, at *8 (directors will be considered interested where insider trades appear suspicious because one can reasonably infer based on allegations that directors engaged in material trading activity at a time when they knew material, non-public information about the company's financial condition); *In re TASER, Int'l S'holder Derivative Litig.*, CV-05-123-PHX-SRB, 2006 WL 687033, at *15 (D. Ariz. Mar. 17, 2006) (same, applying Delaware law).[10]

A plaintiff may also raise reasonable doubt regarding the disinterestedness of directors by demonstrating that they are subject to a "substantial likelihood of liability."[11]  *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007).  As the Delaware Chancery Court has explained, directors "have a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a substantial likelihood.'"  *Id.* (quoting  *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995)); *see also In re Abbott Labs.*

---

[10] *See also Belova v. Sharp*, CV 07-299-MO, 2008 WL 700961, at *11 (D. Or. Mar. 13, 2008) (applying Delaware law and finding that demand was not required because, *inter alia,* directors were alleged to have engaged in insider trading while they, but not the market, knew stock options were manipulated and that they had approved false and misleading SEC filings).

[11] Further, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of the plaintiff's allegations in combination may be sufficient to do so.  *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. Civ. A. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997).

*Derivative S'holders Litig.*, 325 F.3d 795, 808 (7th Cir. 2003) ("*Abbott Labs*").

It is well-established that participating in, condoning, or consciously disregarding serious misconduct cannot constitute a legally protected business decision, and as such is not, and cannot be, a valid exercise of business judgment. *See Aronson*, 473 A.2d at 814; *Veeco*, 434 F. Supp. 2d at 278; *Pfizer*, 722 F. Supp. 2d at 460 (excusing demand under both the *Rales* and *Aronson* tests). Moreover, it is well-settled that demand is excused where directors are alleged to have breached their duties of loyalty and good faith by taking action to illicitly create or maximize the financial benefits of another director or officer at the expense of the corporation and its shareholders. *See, e.g., Weiss v. Swanson*, 948 A.2d 433, 445 (Del. Ch. 2008) (directors faced a substantial likelihood of liability where it was reasonable to infer that they selected favorable dates of stock option grants to unfairly ensure that recipients captured the greatest value of said grants for their recipients, and rejecting defendants' claims at the pleading stage that, *inter alia*, they had no financial motive to do so); *Ryan*, 918 A.2d at 355 (finding that directors faced a substantial likelihood of liability where it was reasonable to infer that directors selected favorable dates of stock option grants to unfairly maximize the value of said grants for their recipients); *Belova*, 2008 WL 700961, at *11 (same); *Weiss,* 948 A.2d at 447-48 (same); *Conrad v. Blank,* 940 A.2d 28, 40 (Del. Ch. 2007); *Engel v. Sexton*, Civ. A. 06-10447, 2009 WL 361108, at *6 (E.D. La. Feb. 11,

21

2009); *Edmonds v. Getty*, 524 F. Supp. 2d 1267, 1276-77 (W.D. Wash. 2007).

When this Action was initiated, the Board consisted of the eleven Director Defendants.    A-106.    Therefore, in order to adequately plead demand futility, Plaintiff needs only raise reason to doubt the disinterestedness or independence of six Director Defendants.  *See Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000).  As discussed herein, particularly in light of defendant Wilson's June 7th Sale, Plaintiff easily satisfies this standard.

**B.    The Lower Court Committed Reversible Error By Failing to Find that Plaintiff Had Adequately Alleged Demand Was Futile**

> **1.    The Lower Court Erred When it Failed to Affirmatively Find That Day And Wilson Are Directly Interested Based On Their Challenged and Suspicious Insider Stock Sales**

Wilson and Day are each directly interested in a demand, because they received personal financial benefits not shared with Lululemon shareholders from the suspicious insider selling transactions challenged in the Action.  A-106.  The Lower Court tacitly acknowledged the obvious – that demand is futile on Wilson and Day – but it nonetheless failed to issue a ruling confirming as much.  A-418 ("Even assuming, without deciding, that demand is excused as to Wilson and Day…").

The Lower Court's "assumption" is undoubtedly correct, as it is black-letter Delaware law that "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by

the stockholders." *Rales*, 634 A.2d at 936. "In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Id.* In order to adequately allege that a director is directly "interested" in a demand based on insider stock sales, a plaintiff need only plead facts supporting the inference that directors "possessed material, nonpublic company information" and "used that information improperly by making trades because [they were] motivated, in whole or in part, by the substance of that information." *See Pfeiffer*, 989 at 691. A complaint that alleges "directly and by imputation" that directors knew of the material information and made trades on that basis satisfies this standard. *Zimmerman*, 2005 WL 2266566, at *8. To support such knowledge by imputation, the plaintiff need only plead facts from which it can reasonably be inferred that the information was "knowable" and that the directors were in a position to know it. *See Pfeiffer*, 989 A.2d at 694. Thus, under Delaware law, directors are directly "interested" based on insider stock sales where, when drawing all reasonable factual inferences in favor of the plaintiff, their trades merely appear suspicious. *See Zimmerman,* 2005 WL 2266566, at *8; *TASER*, 2006 WL 687033, at *15.

*Zimmerman* is particularly instructive with respect to the Delaware standards applicable to pleading "interestedness" based on insider selling. In *Zimmerman*,

23

shortly after the initial public offering of Priceline.com, Inc. ("Priceline") stock,

Priceline entered into a royalty agreement for use of its name and business model

to WebHouse (a private company Priceline was affiliated with) to use Priceline's

"Name Your Own Price" system for the sale of gas and groceries. 2005 WL

2266566, at *2. Although WebHouse was having difficulties, which in turn

brought into question the "scalability" of Priceline's "Name Your Own Price"

system (the scalability issue was disclosed in boilerplate financial filings),

Priceline continued to publicly tout the technology's prospects, while minimizing

the problems both Priceline and WebHouse were facing even though top Priceline

insiders were on notice of these problems via internal "'Pricing Reports,'

'Demographic Analyses,' 'Network Operations Center Reports,' and 'Promotion

Reconciliation Reports.'" *Id.* at *3. While these undisclosed scalability problems

were not revealed to the public, three of Priceline's eleven directors sold Priceline

stock. *Id.* at *3 n.21. The Delaware Chancery Court explained the proper analysis

of demand futility with regards to insider selling, stating:

> The question with regard to demand futility is whether the trading
> directors could impartially consider a shareholder's demand upon the
> corporation to pursue a claim against them based on their trades. ***In
> light of the allegations in the [Complaint] and the value of the
> Selling Defendants' trades, it is a reasonable inference that the
> Selling Defendants would be personally and significantly concerned
> about, and opposed to, any such demand and, thus, interested in
> whether the Priceline Board would pursue a claim based on their
> trades.***

*Id.* at *8.

Under the applicable Delaware standards, the insider sales challenged in the Complaint by both Wilson and Day are undoubtedly suspicious based on Plaintiff's particularized allegations and all reasonable inferences drawn therefrom.  Plaintiff specifically alleges that Wilson and Day sold artificially inflated Lululemon stock based on their possession of material, adverse, non-public information.  A-106.

In particular, Plaintiff alleges that Wilson sold *1 million* shares of Lululemon stock between June 4 and June 7, 2013, exquisitely timed just days before the "surprise" announcement of Day's resignation on June 10, 2013 that sent Lululemon shares tumbling.  A-101.  Most importantly, defendant Wilson sold nearly *$50 million* worth of Lululemon stock on June 7, 2013 -- the very same day he and the rest of the Board were directly, formally informed of Day's impending resignation.  *Id.*  Because Wilson, but not the market, knew this information, he had a duty to either disclose Day's resignation or abstain from trading until it was disclosed.  Specifically, "a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him."  *Chiarella v. U.S.*, 445 U.S. 222, 227 (1980).  "[I]f disclosure is impracticable or prohibited by business considerations or by law, the duty is to abstain from trading."  *S.E.C. v. Obus*, 693 F.3d 276, 285 (2d Cir. 2012).  And, as if there was any doubt regarding the suspiciousness of the June 7th Sale

based on the facts alleged, Vice Chancellor Parsons specifically found, prior to the Lower Court's ruling, that "the June 7 stock sale is sufficiently suspect as to provide a credible basis for inferring possible wrongdoing." A-379.

In the Complaint, Plaintiff alleged that Wilson's June 2013 sales were suspicious because, *inter alia*: (1) his June 7th Sale was the largest single-day sale that he had ever made; (2) his June 4, 2013 and June 7, 2013 sales represented more than half of all of his sales in the Relevant Period; (3) the June 4, 2013 and June 7, 2013 sales were executed at or around Lululemon's all-time stock price high; and (4) although Wilson's 10b5-1 trading plan was purportedly an 18 month plan,[12] at the time the Complaint was filed, he had executed no stock sales whatsoever since June 7, 2013. A-101.

---

[12] Importantly, the fact that defendant Wilson's trades were made pursuant to a purportedly "pre-arranged trading plan" is of no moment at the pleading stage. *See, e.g., In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG, 2013 WL 5486762, at *16 (C.D. Cal. 2013) ("Moreover, the fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales"); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (defendants' attempt to use the existence of a 10b5-1 trading plan as an affirmative defense was rejected where plaintiffs alleged suspiciously timed securities sales). Notably, *Questcor* and *UTStarcom* were securities fraud class actions, in which the court was required to apply materially heightened PSLRA pleading standards and weigh the plaintiffs' and defendants' competing inferences. By contrast in this derivative Action, Plaintiff is exclusively entitled to all reasonable inferences. *See, e.g., In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 982 (Del. Ch. 2007). In the Delaware Action, Vice Chancellor Parsons likewise discounted any relevance to the fact that Wilson's trades were made pursuant to a trading plan. A-384 ("Finally, Wilson's Trading Plan does not, in this case, negate the credible basis of possible wrongdoing or mismanagement the Plaintiffs have shown regarding the June 7 trades.").

Again, Vice Chancellor Parsons' review of Wilson's June 7th Sale largely confirms Plaintiff's allegations.  Specifically, Vice Chancellor Parsons held that Wilson's "unusually large" June 7th Sale, executed "on the same day that he learned of material, nonpublic information that would more likely than not diminish significantly the Company's stock price, raises legitimate questions as to the propriety of that particular sale." A-381.[13]   The highly suspicious timing of Wilson's challenged stock sales independently supports the inference that Wilson faces liability for his insider selling.  *See, e.g., Pfeiffer,* 989 A.2d at 689; *TASER,* 2006 WL 687033, at *9-10; *Zimmerman,* 2005 WL 2266566, at *8.[14]

In the Complaint, Plaintiff also alleged that Day made numerous insider sales directly on the heels of positive Company news (notably, her very own false

---

[13] Notably, the financial press questioned the timing of Wilson's sales.  A-102.  In particular, the *WSJ* noted that the entire Board (including Wilson), but not the public was aware of Day's "resignation" announcement no later than Friday, June 7, 2013 – the very same day that Wilson executed a sale of almost ***$50 million***.  *Id.* The *WSJ* pointed out that "[a] sale at that price would have brought Mr. Wilson about ***$8 million*** less than he reaped by selling his stock the previous week."  *Id.* Another market observer also specifically stated that the timing of defendant Wilson's June 7, 2013 stock sale "***should make any sane person stop and question the timing of these developments***."  *Id.*  Finally, another market observer asked, "can you say insider trading?...the June 7 sale was the largest [sale made pursuant to the Trading Plan in 2013]…one can't help but wonder how far in advance he became aware of Day's planned departure."  *Id.*  Accordingly, Wilson's stock sales appear highly suspicious to independent market observers, as well as Vice Chancellor Parsons.  *Id.*

[14] *See also In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 139-40 (S.D.N.Y. 1999); *Rubinstein v. Collins,* 20 F.3d 160, 169 (5th Cir. 1994).

27

and misleading statements) even though confidential witness accounts confirm that she "acknowledged" internally a "sheer Luon" issue at the Company's annual manager conference, five months before the Black Luon Recall. A-103-104.[15] As with Wilson's above-discussed trades, Day's trades are likewise highly suspicious in terms of their timing. For instance, Day executed sales in September 2012 totaling over $6 million in proceeds, which were made just days after her September 7, 2012 false and misleading statements that the Company had corrected its quality assurance problems. A-103. Further, defendant Day executed sales in December 2012 shortly after she had represented that the Company was not sacrificing quality for growth despite affirmatively knowing and acknowledging in October 2012 that the Company had a "sheer Luon" issue. A-103-104. Finally, defendant Day's September 18, 2013 sales were made directly after her September 12, 2013 statements that the Company was purportedly "back"

---

[15] Allegations that directors sold stock based on their knowledge of "core operational information" directly related to a company's business prospects strongly support the inference that challenged trades are suspicious. *See, e.g,* *Pfeiffer*, 989 A.2d at 694 (finding it was reasonable to infer that directors took advantage of confidential "core operational information" regarding Toll Brothers' business prospects, including critical metrics indicating that public projections likely could not be met, by unloading significant blocks of shares before the market's view of Toll Brothers' prospects dramatically changed); *Dollens v. Zionts*, 01 C02826, 2002 WL 1632261, at *7 (N.D. Ill. July 22, 2002) (demand excused as to directors who were alleged to have sold stock while knowing that a key customer would be cutting back on purchases from corporation through their "access to all of Westell's books, records, and other proprietary information"); *Zimmerman*, 2005 WL 2266566, at *8.

from the Black Luon Recall.  A-104.  Accordingly, in light of the highly suspicious

timing of defendant Day's sales, Plaintiff has adequately alleged that any demand

upon her would be futile.  *See, e.g., TASER,* 2006 WL 687033, at \*9-10 (directors

were interested based on stock sales executed following announcements regarding

upbeat growth guidance, despite knowledge of material, adverse, non-public

information); *Zimmerman*, 2005 WL 2266566, at \*8 (finding directors' sales

suspicious in part due to "the public hyperbole of Priceline's executives").[16]

### 2.    The Lower Court Erred When It Failed To Find That The Entire Board Was Interested In A Demand Based on Their Conduct In Facilitating Wilson's Illicit June 7th Sale

Demand is excused as to every member of the Board because they breached

their fiduciary duties of loyalty and good faith in connection with the belated

disclosure of Day's impending "resignation" on June 10, 2013, which permitted

defendant Wilson to execute, and maximize the value of, the June 7th Sale.  A-

---

[16] Even though demand is clearly excused with respect to defendants Wilson and Day based on their challenged insider sales, a demand is likewise excused because they were both employees of Lululemon at the time the Action was initiated.  A-112-113.  Delaware and federal courts have consistently held that employee-directors of a corporation cannot be considered independent.  *See Rales*, 634 A.2d at 937 ("[T]here is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices."); *In re Adolor Corp. Derivative Litig*., No. 04-3649, 2009 WL 1325738, at \*8 (E.D. Pa. May 12, 2009) (applying Delaware law) ("Plaintiffs argue that any demand on Peacock would be futile as a result of his position as the President and Chief Executive Officer of Adolor.  We agree.").  Thus, it is clear that a demand upon Wilson and Day is excused for multiple reasons.

106-107.[17]  In addition, or alternatively, the members of the Board failed to take action to cause Wilson to abstain from trading Lululemon stock until Day's resignation was disclosed.  In either case: (a) delaying the announcement of Day's resignation for Wilson's pecuniary benefit; or (b) consciously disregarding Wilson's insider sales made with possession of adverse, non-public, material information that the Board indisputably also possessed is not a valid exercise of business judgment.  *Id.*

Stated simply, it is an undisputed ***fact*** that the entire Board ***knew*** about Day's "resignation" no later than June 7, 2010.  A-198.  Yet, by disclosing Day's resignation on June 10, 2010, three days ***after*** Wilson's largest single-day stock sale ever, the Board ensured that the value of Wilson's trades would be maximized. *Id.*  Given the Board's longstanding preferential treatment of Wilson,[18] and especially the Director Defendants' own repeated admissions in public filings that

---

[17] As discussed in the Complaint, this is particularly true for the members of the Audit Committee (defendants Casey, Glenn, Morfitt, and White) who, pursuant to the Company's Audit Committee Charter, are responsible for, *inter alia*, reviewing Company earnings press releases prior to their issuance (and therefore have control over their timing), and approving all related party transactions.  A-106-107.

[18] For example, the Board, and in particular, the Audit Committee (which is specifically tasked per its Charter with approval of all related party transactions) has previously, *inter alia*, approved a lucrative multi-year real estate lease between Lululemon and another company owned by Wilson, 0823038 BC Ltd.  A109-110. Additionally, the Audit Committee has approved the ongoing agreement between Lululemon and another company, Conrad Group Inc., which is owned by Wilson's sister-in-law, for "personal and professional development coaching" to Lululemon personnel.  *Id.*

Wilson exerts significant control and influence over the affairs of the Company and the Board (including the election of directors), it is reasonable to infer from the timing of the events described in the Complaint that the Board intentionally withheld disclosing Day's impending resignation until Wilson's largest Relevant Period insider stock sale of approximately *$50 million* was executed.    *Id.*

Significantly, Vice Chancellor Parsons likewise found that the rest of the Board may be liable for their actions (and/or inactions) in conjunction with defendant Wilson's June 7th Sale.  In particular, Vice Chancellor Parsons, noting "the unusual timing and circumstances of Wilson's June 7 sale," found that in "the absence of any evidence of public statements or other indications that the Company's board examined the trade or Wilson's conduct, [there is] a credible basis for inferring that the Company's board may have mismanaged this situation, in terms of monitoring."  A-383-384.[19]

In addition to the obviously suspicious timing of the disclosure of Day's resignation relative to Wilson's challenged insider trades, in and of itself, it is reasonable to infer that the Board timed the disclosure of Day's resignation for

---

[19] To the extent that Defendants attempt to argue that the timing of the June 7th Sale and the announcement of Day's resignation were a "coincidence," this argument is wholly unavailable because in a derivative action, the plaintiff's allegations are accepted as true and plaintiffs are exclusively entitled to the benefit of all reasonable inferences.  *Getty*, 524 F. Supp. 2d at 1277 (applying Delaware law and excusing demand) ("where there is an innocent explanation offered in addition to the more nefarious explanation [] the court [should not] accept the innocent explanation.").

31

Wilson's financial benefit (or failed to take action to cause Wilson to abstain from trading Lululemon stock until Day's resignation was disclosed) because Wilson has never been and is no ordinary "garden variety" director. Wilson has always been and remains, simply put, the most powerful individual at Lululemon in any capacity (director, officer, or otherwise). A-109-110. Indeed, the Director Defendants have repeatedly admitted that Wilson "is able to exercise significant influence over our affairs," including the fact that Wilson can "influence or control…the election of directors." *Id.*[20] The Delaware Supreme Court has recognized that demand is futile where plaintiffs "allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Aronson*, 473 A.2d at 816 (quoting *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971)). Based on Plaintiff's particularized allegations regarding the circumstances

---

[20] According to the *WSJ*, Wilson created and has fostered an "insular and unusual corporate culture" at Lululemon, and as *Fortune* has similarly observed, "[Wilson's] fingerprints are all over the company's policies and principles." A-109-110. The *WSJ* has reported that Wilson urges directors of the Company (among others) to attend self-help sessions at the Landmark Forum, a controversial purported "self-help" organization. *Id.* Robert Meers, a former director of Lululemon, has publicly stated that although he did not personally wish to do so and initially resisted, during his tenure at Lululemon he reluctantly attended Landmark Forum sessions because "[i]t was made clear to me that I had to go," and perhaps more importantly, "[i]f you didn't buy into the process, you were out of the club." *Id.*

surrounding Wilson's June 7th Sale and the role the rest of the Board played in maximizing the value of that trade (or permitting it), the Action is such a case.

Indeed, it is well-settled that demand is futile where directors are alleged to have breached their duties of loyalty and good faith by taking action to illicitly create or maximize financial benefits of another director or officer at the expense of the corporation and its shareholders. *See, e.g., Weiss,* 948 A.2d at 445 (directors faced a substantial likelihood of liability where it was reasonable to infer that they selected favorable dates of stock option grants to unfairly ensure that recipients captured the greatest value of said grants for their recipients, and rejecting defendants' claims at the pleading stage that, *inter alia*, they had no financial motive to do so); *Ryan*, 918 A.2d at 355 (finding that directors faced a substantial likelihood of liability where it was reasonable to infer that directors selected favorable dates of stock option grants to unfairly maximize the value of said grants for their recipients); *Belova*, 2008 WL 700961, at *11 (same); *Weiss,* 948 A.2d at 447-48 (same); *Conrad,* 940 A.2d at 40; *Engel*, 2009 WL 361108, at *6; *Getty*, 524 F. Supp. 2d at 1276-77.

Here, based on Plaintiff's particularized allegations, it is reasonable to infer that the entire Board (and especially the members of the Audit Committee, who controlled the timing of Lululemon's earnings press releases) knew that Day was "resigning" no later than June 7, 2013 but delayed announcing that for several days

33

in order to ensure that defendant Wilson could maximize the value of the largest stock sale he had ever made on that same date.  Similarly (or alternatively), Plaintiff adequately alleged that the Board, despite its knowledge of Day's resignation no later than June 7, 2013, took no action to cause Wilson to abstain from trading until after the disclosure of Day's resignation was made, and notably, despite the significant passage of time and widespread media criticism of Wilson's suspicious trades, the Director Defendants have revealed no disciplinary or other remedial action taken against Wilson.  Accordingly, demand is excused.

## CONCLUSION

Plaintiff respectfully submits that the ruling of the Lower Court should be reversed, and this case remanded for further proceedings consistent with this Court's ruling.

Dated:  August 8, 2014                    Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**

By:  *s/ Brett D. Stecker*
    Robert B. Weiser
    Brett D. Stecker
    Jeffrey J. Ciarlanto
    22 Cassatt Avenue, First Floor
    Berwyn, PA 19312
    Telephone:  (610) 225-2677
    Facsimile:  (610) 408-8062
    rw@weiserlawfirm.com
    bds@weiserlawfirm.com
    jjc@weiserlawfirm.com

    *Counsel for Plaintiff-Appellant*
    *Thomas Canty*

34

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 8,707 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

DATED:  August 8, 2014

*s/ Brett D. Stecker*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable Katherine B. Forrest,
  dated April 9, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-1

Order of the Honorable Katherine B. Forrest, dated April 9, 2014 . . . . . SPA-27

Judgment Appealed From, dated April 25, 2014 . . . . . . . . . . . . . . . . . . . . SPA-52

**SPA-1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

| | | |
|---|---|---|
| THOMAS CANTY, | : | |
| | : | |
| Plaintiff, | : | 13 Civ. 5629 (KBF) |
| -v- | : | |
| | : | OPINION & ORDER |
| | : | |
| CHRISTINE MCCORMICK DAY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

-----------------------------------------------------------X

| | | |
|---|---|---|
| TAMMY M. FEDERMAN, | : | |
| | : | |
| Plaintiff, | : | 13 Civ. 5977 (KBF) |
| -v- | : | |
| | : | OPINION & ORDER |
| | : | |
| CHRISTINE MCCORMICK DAY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

-----------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Plaintiffs Thomas Canty and Tammy M. Federman bring these derivative

actions on behalf of nominal defendant lululemon athletica inc. ("lululemon" or the

"company") against thirteen current or former lululemon directors or executives for

violations of Section 14(a) of the Securities Exchange Act and Rule 14a-9

thereunder, as well as state law claims for breaches of fiduciary duties, arising out

of "serious quality control problems" and "materially false and misleading

statements" that were made concerning those problems. (See Am. Compl. ¶¶ 2,

209-238, ECF No. 20.)  Plaintiffs' claims center around lululemon's March 2013

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **APR 0 9 2014**

recall of one of its "flagship" products—its black luon yoga pants—and the events that followed, including the announcement of the departure of lululemon's chief executive officer ("CEO") and stock sales by its founder and Chairman of the Board of Directors in June 2013.  (See id. ¶¶ 15-34.)

Plaintiffs originally filed these actions on August 12 and 23, 2013, respectively.  On October 3, 2013, these actions were transferred to the undersigned and consolidated for pretrial purposes.[1]  In an order dated October 24, 2013, and as discussed at the conference that day, the Court ordered plaintiffs to either file an amended complaint or designate one of the two previously filed complaints as the operative complaint.  (ECF No. 9.)[2]  On November 8, 2013, plaintiffs designated the complaint in Canty v. Day et al., as the operative complaint.  (ECF No. 11.)  Defendants thereafter moved to dismiss the operative complaint on December 11, 2013 pursuant to Federal Rule of Civil Procedure 23.1.  (ECF Nos. 12-14.)  By letter dated December 18, 2013, plaintiffs requested leave to file an amended complaint.  (ECF No. 15.)  The Court granted plaintiffs' request, indicating that it was its intention to rule on the sufficiency of the pleadings only once.  (ECF No. 18.)

Plaintiffs thereafter filed an amended complaint on January 17, 2014.  Defendants again moved to dismiss pursuant to Rule 23.1 on January 31, 2014, and the motion became fully briefed on February 21, 2014.  The Court held argument on the motions on April 4, 2014.

---

[1] Also pending before this Court is the related securities class action litigation, In re Lululemon Securities Litigation, 13 Civ. 4596 (KBF), which involves many of the same facts and allegations as are at issue in these actions.

[2] Unless otherwise specified, all ECF references in this Opinion are to the docket in Canty v. Day et al., 13 Civ. 5629 (KBF).

For the reasons set forth below, defendants' motion to dismiss is GRANTED and these actions are DISMISSED without prejudice.

I.    FACTS

A.    The Parties

Plaintiffs Canty and Federman have been holders of lululemon stock since June 2011 and May 2010, respectively.  (Am. Compl. ¶¶ 46, 47.)

Defendants Robert Bensoussan, Michael Casey, RoAnn Costin, Christine McCormick Day, William Glenn, Martha A.M. Morfitt, Rhoda M. Pitcher, Thomas S. Sternberg, Jerry Strizke, Emily White, and Dennis J. Wilson (collectively, with the exception of Day and Wilson, the "Director Defendants") served as lululemon's Board of Directors on the date the instant actions were filed.  (Id. ¶¶ 49-50, 53-61.) Director Defendants Casey, Morfitt, Glenn, and White served on the Board's Audit Committee during the "Relevant Period" (which is defined as 2012 to present).  (Id. ¶¶ 1, 53, 54, 57, 61, 63.)  Director Defendants Bensoussan, Casey, Pitcher, and Sternberg served on the Board's Nominating and Governance Committee during the Relevant Period.  (Id. ¶¶ 54, 55, 58, 59, 64.)

Day served as lululemon's CEO from July 2008 until January 2014.  (Id. ¶ 49.)  Day's resignation was announced on June 10, 2013, but she remained with lululemon until her successor officially took over as CEO in January 2014.  (Id.)

Wilson is lululemon's founder, and has been a member of the Board and the company's largest individual shareholder since 1998.  (Id. ¶ 50.)  Wilson has served as Chairman of the Board since 1998, but announced in December 2013 that,

although he will remain on the board, he intends to resign as Chairman shortly before lululemon's annual meeting in June 2014.  (Id.)  The company's Annual Report on Form 10-K that was filed on March 21, 2013 states that Wilson "controls a significant percentage of our stock and is able to exercise significant influence over our affairs," and that he "is able to influence or control . . . the election of directors."  (Id.)

Defendant John E. Currie has served as an Executive Vice President ("EVP") and CFO at lululemon since January 2007.  (Id. ¶ 51.)  Defendant Sheree Waterson served as Chief Product Officer until April 15, 2013, and previously served as EVP, General Merchandise Management and Sourcing beginning in June 2008.  (Id. ¶ 52.)  Neither Currie nor Waterson are alleged to be or to have been directors.

B.    Lululemon

Nominal defendant lululemon is a Delaware corporation with its principal executive offices in Vancouver, British Columbia.  (Id. ¶¶ 1, 48.)

Lululemon designs and sells premium athletic apparel and accessories, including yoga pants, shorts, and tops.  (Id. ¶ 3.)  Lululemon's business model involves selling garments at high prices (approximately $100 per pair of pants and $60 per shirt) based upon their purported high quality, offering minimal discounts, and maintaining low store inventory to drive demand.  (Id. ¶¶ 3, 70, 142.)  Lululemon's most important and popular products are women's fitness pants designed from a proprietary material known as "luon."  (Id. ¶ 71.)

During Day's tenure as CEO, the Company's apparel sales led to enormous growth. (Id. ¶ 83.) In just a few short years, from 2009 to 2012, lululemon quadrupled annual revenues to $1.37 billion, quadrupled gross profits to $763 million, and more than doubled its number of stores to over 200. (Id.) Fueled by strong financial results, lululemon's stock price increased dramatically, from approximately $4 per share at the beginning of 2009 to approximately $70 per share at the end of 2012. (Id. ¶ 85.) Black-colored luon products, a significant driver of sales, contributed substantially to this success. (Id.)

C.    The Alleged Wrongdoing

Plaintiffs allege that the Director Defendants were aware of certain "red flags" concerning quality control issues at lululemon. Specifically, in November 2007, The New York Times revealed that the Company's "Vitasea" line of seaweed fabric—which lululemon claimed released "marine amino acids, minerals, and vitamins into the skin"—in fact contained no seaweed at all. (Id. ¶¶ 7, 90.) Lululemon was forced to apologize for and withdraw its prior claims of the line's health benefits and Wilson was forced to concede that in fact no tests had been conducted to confirm the veracity of these claims. (Id. ¶¶ 90, 91.)

In December 2010, it was revealed that the company shipped and distributed reusable shopping bags that had been printed using ink containing high levels of lead. (Id. ¶¶ 8, 94.)

In late 2011 and 2012, many customers complained that luon garments "bled" when used during exercise, or when it came into contact with sweat or water. (Id. ¶¶ 9-10, 96, 100.)

In February and March 2013, customers began reporting that certain brightly colored luon pant fabrics were sheer when worn. (Id. ¶ 106.) Lululemon initially offered a disclaimer with these products as to their "sheerness." (Id.) Ultimately, however, following the close of trading on March 18, 2013, lululemon announced a recall of its black luon pants and crops, and offered refunds for all affected products (the "Black Luon Recall," or the "Recall"). (Id. ¶ 107.) This resulted in a reduction in the company's revenue guidance for the first quarter of 2013 by approximately $20 million, or 5%, from $350-$355 million to $333-$343 million. (Id.) The company announced three days later that lululemon expected to lose $57-$67 million in revenue and $0.25-$0.27 in earnings per share ("EPS") during the 2013 fiscal year due to the Recall. (Id.)

Day's resignation from lululemon was announced in an earnings press release on June 10, 2013, after the close of trading that day. (Id. ¶¶ 129, 168.) Media reports suggested that her departure was tied to the Black Luon Recall. (Id. ¶¶ 130-31.)

According to news reports in October 2013, lululemon continued to receive additional complaints about the transparency of its yoga pants following the Recall, as well as "pilling"—small balls of fabric accumulating on the surface of the product. (Id. ¶ 133.) On December 12, 2013, lululemon announced a $30 million cut to

6

earnings guidance for the fourth quarter of 2013, or nearly 5%. (Id. ¶ 138.) On January 13, 2014, the company revised its fourth quarter 2013 revenue and EPS projections downward due to a "meaningful" drop in sales attributed to quality control failures and related events. (Id. ¶ 177.)

On June 7, 2013, Wilson sold 607,545 lululemon shares for proceeds of nearly $50 million. (Id. ¶ 196.) This was the largest single day sale he ever made. (Id. ¶ 197.) All told, between June 4 and June 7, 2013, Wilson sold one million lululemon shares for proceeds totaling $81 million at stock prices near lululemon's all-time high. (Id.) These sales constituted more than half of all of his sales during the Relevant Period. (Id. ¶ 197.)

Over a six-month span during the Relevant Period, Wilson sold almost 2.3 million lululemon shares for proceeds of over $184 million. (Id. ¶ 194.) Plaintiffs challenge Wilson's trades from June 4-7, 2013 as suspicious based on the timing of the announcement of Day's resignation—after the close of trading on June 10, 2013—and the fact that the Board was informed of her resignation on June 7 (the previous Friday). (Id. ¶¶ 33, 169.) Plaintiffs cite media reports which state that Day's resignation announcement was "unexpected." (Id. ¶ 171.) Plaintiffs allege that the Director Defendants and the members of the Audit Committee "caused" the press release disclosing Day's resignation to be issued on June 10, 2013. (Id. ¶ 208.b.i.)

Plaintiffs allege that Wilson's stock sales were made pursuant to "a pre-arranged stock trading plan that Wilson agreed to in December 2012." (Id. ¶ 32.)

Plaintiffs allege that Wilson's trading plan allowed him to sell lululemon stock on a semi-regular basis, and up to 5.7 million shares over an eighteen-month period. (Id. ¶ 195.)  Plaintiffs further allege that the trading plan did not establish pre-set amounts for each planned sale, and that there were no limits placed on Wilson's discretion regarding the size of these sales. (Id. ¶¶ 32 n.6, 195.)

As compared to the company's stock price at the end of the day on June 10, 2013, lululemon's stock price fell by nearly 18% by the end of the day on June 11, 2013, and by a total of 22% by the end of the day on June 12, 2013. (Id. ¶¶ 170-71.)

During the Relevant Period, Day sold 196,043 shares of lululemon stock for over $14 million. (Id. ¶ 200.)  Plaintiffs allege that Day capitalized on spikes in the stock price in September 2012, December 2012, and September 2013 following statements she issued concerning the company's quality assurance issues. (Id. ¶¶ 201-03.)

D.    April 30, 2013 Proxy Statement

Plaintiffs allege that "Defendants"[3] caused lululemon to disseminate a proxy statement dated April 30, 2013 (the "2013 Proxy") to shareholders in connection with the company's annual shareholder meeting. (Id. ¶ 204.)  Plaintiffs allege that "Defendants drafted, approved, reviewed and/or signed the 2013 Proxy before it was filed with the SEC and disseminated to Lululemon shareholders." (Id.)  Plaintiffs allege that "Defendants knew, or were deliberately reckless in not knowing, that the 2013 Proxy was materially false and misleading." (Id.)

_____

[3] Plaintiffs use the term "Defendants" to refer to all thirteen defendants in both actions.

8

The two pieces of the 2013 Proxy that are excerpted in the Amended Complaint concern defendants Day and Wilson.  With respect to Day, the 2013 Proxy describes her history with the company, her prior work history, her service on other boards of directors, and her educational background.  (Id.)  The 2013 Proxy states: "Our board of directors selected Ms. Day to serve as director because she is our Chief Executive Officer and she has extensive experience in sales and marketing, managing retail focused operations, international operations, corporate finance and strategic planning."  (Id.)

With respect to Wilson, the 2013 Proxy notes that Wilson's current position is Chairman of the Board.  (Id.)  The 2013 Proxy states: "Our board of directors believes that Mr. Wilson, as the founder of lululemon, is in a unique position to support continuity in both the product vision and the cultural values of our company that have been an integral part of our success, and his role as Chairman of the Board enables him to be more effective in this role."  (Id.)

II.     LEGAL STANDARDS

A.     Rule 23.1 Pleading Requirements

Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 23.1.  Rule 23.1 requires that a plaintiff in a shareholder derivative action "state with particularity . . . any effort by the plaintiff to obtain the desired actions from the directors . . . and . . . the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  This rule sets forth a "rule of pleading" as to "the specificity of facts alleged with regard to efforts made to urge a

corporation's directors to bring the action in question," which is referred to as "demand" on the corporation. Halebian v. Berv, 590 F.3d 195, 206 n.7 (2d Cir. 2009) (internal quotation marks and citation omitted).

The "adequacy" of a plaintiff's pre-suit demand efforts "is to be determined by state law absent a finding that application of state law would be inconsistent with a federal policy underlying a federal claim in the action." Id. (internal quotation marks and citation omitted). It is undisputed that lululemon is a Delaware corporation and that Delaware law thus governs. See Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004) ("The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief.").

"'In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiffs' substantive claim. Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf.'" In re SAIC Inc. Derivative Litig., 948 F. Supp. 2d 366, 376 (S.D.N.Y. 2013) (citation omitted). "'Because Rule 23.1 requires that plaintiffs make particularized allegations, it imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6).'" In re Am. Int'l Grp., Inc. Derivative Litig., 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010), aff'd, 415 F. App'x 285 (2d Cir. 2011) (citation omitted).

B.    The Demand Requirement

Derivative suits permit "an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" Kamen v. Kemper Fin. Servs., 500 U.S. 90, 95 (1991) (emphasis in original) (citing Ross v. Bernhard, 396 U.S. 531, 534, (1970)).

Under Delaware law, "[a] stockholder may not pursue a derivative suit to assert a claim of the corporation unless the stockholder: (a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." Wood v. Baum, 953 A.2d 136, 140 (Del. 2008). "[T]he demand requirement implements 'the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders.'" Kamen, 500 U.S. at 101 (citation omitted). "[T]he demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations." Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984).

"The purpose of the demand requirement is to affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." Kamen, 500 U.S. at 96 (internal quotation marks and citations omitted). In short, "[t]he purpose of requiring a precomplaint demand is to

11

protect the directors' prerogative to take over the litigation or to oppose it." Id. at 101. "A board may in good faith refuse a shareholder demand to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits. It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests." In re InfoUSA, Inc. S'holders Litig., 953 A.2d 963, 986 (Del. Ch. 2007).

These interests are particularly relevant where, as here, a shareholder derivative action seeks recovery on the basis of the same allegations alleged against the company in a federal securities class action also pending before this Court.[4] See South v. Baker, 62 A.3d 1, 25 (Del. Ch. 2012) (noting that the pursuit of a derivative action during the pendency of other related litigation against the corporation "may well compromise the corporation's position on the merits, thereby causing or exacerbating precisely the harm that the . . . plaintiff ostensibly seeks to remedy").

C.    When Demand Is Excused

Under Delaware law, demand is not required if the facts pled show that such demand would have been futile. Aronson, 473 A.2d at 808. Demand is futile when, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was

---

[4] As is described in detail in defendants' opening brief, the allegations in the Amended Complaint are not only related to those advanced by lead plaintiffs in In re Lululemon Securities Litigation, 13 Civ. 4596 (KBF), they are in many instances copied verbatim or with minimal conforming changes from the operative complaint in that action. (See Mem. of Law at 7-8, ECF No. 22.) This dramatic degree of overlap further heightens the importance of the demand requirement for bringing a derivative action as applied to the facts and circumstances of the instant actions.

otherwise the product of a valid exercise of business judgment." Id. at 814. In cases where plaintiffs allege that board inaction, rather than board action, renders demand futile, courts focus on the first prong of the Aronson test. In such cases, courts must determine whether the "particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993); see also Wood, 953 A.2d at 140 (describing situations in which to apply the Aronson and Rales tests).

In light of the allegations in the Amended Complaint and the arguments provided in opposition to the instant motions—that the Defendant Directors caused, allowed, or permitted lululemon to disseminate false and misleading information, failed to maintain internal controls, and failed to take action as to Wilson's June 2013 stock sales[5] (see Am. Compl. ¶¶ 208(b)-(f); Opp. at 17-22, ECF No. 24)—there can be no dispute that the allegations in these actions implicate the Rales test for demand futility concerning board inaction.

The reasonable doubt standard "can be said to mean that there is a reason to doubt"; "[t]his concept is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." Grimes v.

---

[5] Though plaintiffs argue that the Defendant Directors "facilitated" Wilson's June 2013 stock sales, the manner of facilitation they allege is failing to act so as to stop Wilson from executing those sales. (Opp. at 17-18.) Plaintiffs do not allege that lululemon's directors made a decision to make false or misleading statements, or to fail to maintain internal controls, so "the subject of the derivative suit is not a business decision of the board." Rales, 634 A.2d at 934.

13

Donald, 673 A.2d 1207, 1217 (Del. 1996).  Though the reasonable doubt standard does not require plaintiffs to demonstrate a reasonable probability of success on the merits, see Rales, 634 A.2d at 934, it does not water down the pleading threshold requiring that reasonable doubt be pled with particularized facts sufficient to overcome the presumption that directors are "faithful to their fiduciary duties." Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d at 1050 n.26, 1048-49 (Del. 2004).  Courts "draw all reasonable inferences in the plaintiff's favor," but only if they "logically flow from particularized facts alleged by the plaintiff." Wood, 953 A.2d at 140 (quoting Beam, 845 A.2d at 1048).

Under Delaware law, plaintiffs who are seeking to allege such reasonable doubt may do so in at least two ways.  First, plaintiffs must allege particularized facts that "show that a given director is personally interested in the outcome of the litigation, in that the director will personally benefit or suffer as a result of the lawsuit." InfoUSA, 953 A.2d at 985.  The "existence of some financial ties between the interested party and the director, without more, is not disqualifying"; "[t]he inquiry must be whether, applying a subjective standard, those ties were material, in the sense that the alleged ties could have affected the impartiality of the individual director." Kahn v. M & F Worldwide Corp., No. 334, 2013, 2014 WL 996270, at *10 (Del.  Mar. 14, 2014) (citations omitted).

Second, plaintiffs must allege particularized facts that demonstrate a director faces a substantial likelihood of liability related to the subject of the proposed demand. See, e.g., Ryan v. Gifford, 918 A.2d 341, 355 (Del. Ch. 2007) (internal

14

quotation marks and citation omitted).  A "'mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors'" in order to excuse demand.  <u>Wood</u>, 953 A.2d at 141 n.11 (quoting <u>Aronson</u>, 473 A.2d at 815).  "Without a substantial threat of director liability, a court has no reason to doubt the board's ability to address the corporate trauma and evaluate a related demand."  <u>South</u>, 62 A.3d at 14.  "A simple allegation of potential directorial liability is insufficient to excuse demand, else the demand requirement itself would be rendered toothless, and directorial control over corporate litigation would be lost."  <u>In re Goldman Sachs Grp., Inc. S'holder Litig.</u>, Civ. A. No. 5215-VCG, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011).

"[A] derivative complaint must plead facts specific to each director, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand."  <u>Desimone v. Barrows</u>, 924 A.2d 908, 943 (Del. Ch. 2007); <u>see</u> <u>Blaustein v. Lord Baltimore Capital Corp.</u>, 84 A.3d 954, 958 (Del. 2014) ("[A] plaintiff must allege with particularity that a majority of the board lacks independence or is otherwise incapable of validly exercising its business judgment.").  The "'group' accusation mode of pleading demand futility" is insufficient.  <u>In re Citigroup Inc. S'holder Derivative Litig.</u>, 964 A.2d 106, 121 n.36 (Del. Ch. 2009); <u>see</u> <u>In re ITT Corp. Derivative Litig.</u>, 588 F. Supp. 2d 502, 511 (S.D.N.Y. 2008) ("Whether the Directors face a substantial likelihood of liability must be determined on a director-by-director basis, and thus Plaintiffs' conflation of all the directors into a single entity is insufficient under Rule 23.1.").

In sum, alleging that demand is excused is "a difficult feat." <u>Ryan</u>, 918 A.2d at 352 n.23 (Del. Ch. 2007). "[C]onsistent with the long-standing principle that directors and not shareholders manage a corporation, the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare." <u>Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines</u>, 534 F.3d 779, 782-83 (D.C. Cir. 2008).

III.   DISCUSSION

In the Amended Complaint, plaintiffs allege one federal claim—violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9 thereunder as a result of alleged false or misleading statement in the 2013 Proxy (Count VII). Plaintiffs allege two sets of state law claims: (1) breach of fiduciary duty for (i) disclosure violations (Count I), (ii) failures to maintain internal controls (Count II), and (iii) insider trading (Count IV), and (2) claims arising out of the alleged breaches of fiduciary duty: (i) unjust enrichment (Count III), (ii) abuse of control (Count V), and (iii) gross mismanagement (Count VI). All of plaintiffs' claims are asserted against all defendants except the Count IV insider trading claim, which is asserted against defendants Wilson and Day only.

Plaintiffs concede that no demand to institute these actions was made on lululemon's Board of Directors; instead, plaintiffs allege demand is futile and excused. (<u>See</u> Am. Compl. ¶ 208.) Plaintiffs further concede that, because the Board consisted of the eleven Director Defendants at the time these actions were initiated (<u>id.</u>), plaintiffs must raise a reasonable doubt as to the disinterestedness or

16

independence of six directors in order to adequately plead demand futility.[6] (Opp. at 12.) Even assuming, without deciding, that demand is excused as to Wilson and Day, plaintiffs fail to allege the kind of particularized allegations required by Rule 23.1 and Delaware law as to <u>any</u> (let alone four) Director Defendants.

Plaintiffs argue that demand is excused as to all Director Defendants for two sets of reasons: (A) that the Director Defendants' "conscious inaction in the face of Wilson's illicit trading is the result of a lack of independence and domination of Wilson over the Board" (Opp. at 18); and (B) that the Director Defendants' face a substantial likelihood of liability because they consciously or recklessly disregarded "red flags" concerning lululemon's quality control issues (<u>id.</u> at 20.)

These arguments are without merit.

A.    <u>Control and Domination by Wilson</u>

Plaintiffs argue that the allegations in the Amended Complaint as to Wilson's stock sales, their timing, and the Board's knowledge of those sales, coupled with more general allegations about Wilson's control and influence over the Board, are sufficient to plead demand futility as to all Director Defendants. (<u>Id.</u> at 18-19.) According to plaintiffs, "the only reasonable, common sense, pragmatic inference fairly drawn from the facts is that the Board cannot act independently or with disinterest here." (<u>Id.</u> at 19.) At oral argument, plaintiffs' counsel articulated this argument more bluntly: demand is excused as to at least the four Director Defendants who were members of the Audit Committee because they failed to take

---

[6] Non-Director Defendants Currie and Waterson are not relevant to determining whether demand is futile. See <u>In re Forest Labs., Inc. Derivative Litig.</u>, 450 F. Supp. 2d 379, 381 (S.D.N.Y. 2006).

any punitive action toward Wilson after learning of his June 2013 trading, and that

this failure shows both domination and control by Wilson and a substantial

likelihood of liability for these Director Defendants.[7]  (See 4/4/14 Tr. at 59-66.)

The Court disagrees with both formulations of plaintiffs' argument.  Under

Delaware law, plaintiffs "must plead facts that would support the inference that

because of the nature of a relationship or additional circumstances . . . the non-

interested director would be more willing to risk his or her reputation than risk the

relationship with the interested director."  Beam, 845 A.2d at 1052.  Whether

plaintiffs have pled sufficient facts must be resolved on a director-by-director basis

through an analysis of the particularized factual allegations.  Khanna v. McMinn,

No. Civ. A. 20545-NC, 2006 WL 1388744, at *15 (Del. Ch. May 9, 2006).

The allegations in the Amended Complaint fall far short of this standard.

Plaintiffs fail to plead particularized allegations as to the disinterestedness or

independence of any of the Director Defendants as it relates to Wilson and his June

2013 trading.  Plaintiffs primarily rely on an argument that Wilson allegedly

engaged in insider trading prior to Day's resignation announcement on June 10,

2013, that the Director Defendants knew it at that time or very shortly thereafter,

and by doing nothing, demonstrated their lack of independence.  The allegations in

---

[7] Plaintiffs' assertion that demand is excused because the Director Defendants faced a substantial likelihood of liability is discussed more fully in Section III.B infra.  Though plaintiffs' counsel suggested at oral argument that this liability was for aiding and abetting Wilson's alleged insider trading (see 4/4/14 Tr. at 62), no such claim is asserted against the Director Defendants in the Amended Complaint.  (Count IV, for state law insider trading, is asserted against Wilson and Day only.)  Further, any breach of fiduciary duty claim premised on the Director Defendants' conduct related to Wilson's June 2013 trading fails for the same reasons set forth herein—plaintiffs do not plead particularized facts as to the knowledge of any Director Defendants that Wilson's trading was inconsistent with his trading plan, and instead ask the Court to make unreasonable inferences as to their motivations for alleged inaction.

Amended Complaint do not support this story or the inferences plaintiffs urge this Court to make.

First, though plaintiffs allege that the Director Defendants knew of Day's resignation no later than June 7, 2013 (see Am. Compl. ¶ 198), they do not allege any facts as to the Director Defendants' knowledge of Wilson's trading during the period June 4-7, 2013. Second, though plaintiffs allege that Wilson's stock sales were made pursuant to a trading plan that was executed in December 2012 and permitted stock sales on a semi-regular basis (see id. ¶¶ 32 n.6, 195), they do not allege any facts that show Wilson's trading was inconsistent with that plan.[8] Third, though plaintiffs allege that both Wilson's trading and the fact that he had a trading plan were public knowledge (see 4/4/14 Tr. at 59-61; Am. Compl. ¶¶ 33, 198), they do not allege any facts that tend to show that the Director Defendants knew Wilson's trading was inconsistent with that plan.

Instead, plaintiffs ask this Court to infer that the Director Defendants were under such domination and control by Wilson that they deliberately exposed themselves to the risk of individual liability related to Wilson's June 2013 trading, which they believed to be improper, rather than resigning from the Board. Though Wilson may have exercised significant influence over the Board and the company's

---

[8] Though Wilson's trading plan is explicitly referenced in the Amended Complaint, the plan itself has not been submitted in connection with the instant motions. Wilson's trading plan was filed under seal as an exhibit in support of lululemon's motion to dismiss in the related securities class action. See In re Lululemon Sec. Litig., No. 13 Civ. 4596 (KBF), ECF No. 52-1 (S.D.N.Y. Feb. 18, 2014). The Court need not reach the issue of whether Wilson's trading plan is properly considered on the instant motion to dismiss because, even accepting plaintiffs' allegations about Wilson's trading and his trading plan as true, plaintiffs fail to allege facts sufficient to excuse demand on this basis.

19

culture, there are no particularized allegations in the Amended Complaint that credibly suggest such a conclusion.

Plaintiffs also fail to allege particularized facts that tend to show Wilson controlled and dominated the Director Defendants because they supposedly "facilitated" Wilson's re-election to the Board by not disclosing "internal turmoil" at lululemon.  (Opp. at 18-19; Am. Compl. ¶ 236.)  As is discussed in Section III.B.1 infra, plaintiffs fail to allege particularized facts that tend to show that the 2013 Proxy associated with this election was materially false or misleading at the time it was issued.  Plaintiffs fail to allege any particularized facts that tend to show that the Director Defendants prepared or were directly responsible for these disclosures; in fact, the general allegations that the Director Defendants caused or allowed lululemon to issue certain statements (see Am Compl. ¶ 211) are the kind of allegations that courts often find insufficient for the purpose of excusing demand.[9] See Citigroup, 964 A.2d at 133 n.88, 134; see also In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig., No. 11 Civ. 4544 (WHP), 2012 WL 3293506, at *9 (S.D.N.Y. Aug. 14, 2012) (citing Citigroup, 964 A.2d at 132-34).

In sum, plaintiffs' allegations concerning Wilson's stock sales, as they relate to the Director Defendants, are general and conclusory rather than factual and specific, and thus fail to overcome the presumption of directorial independence and to excuse demand.

---

[9] The Court notes that plaintiffs did not respond to this argument in either their opposition papers or at oral argument in any meaningful way.

20

SPA-21

B.    Substantial Likelihood of Liability

Plaintiffs next argue, in substance, that the Director Defendants face a substantial likelihood of liability, so as to excuse demand, because they were on notice of red flags concerning quality control issues at lululemon and failed to act in order to correct them.  (Opp. at 20-22.)  This argument, viewed in context of each of the claims alleged in the Amended Complaint against the Director Defendants,[10] is without merit.  Plaintiffs fail to allege a substantial likelihood of liability for any of the Director Defendants as to any of these claims.

1.    Section 14(a) of the Securities Exchange Act (Count VII)

Liability under Section 14(a) and Rule 14a-9 thereunder requires, inter alia, a materially false or misleading statement in a proxy statement.  See 17 C.F.R. § 240.14a-9 ("[n]o solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which . . . is false or misleading"); In re J.P. Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (requiring "a material misrepresentation or omission"); see also Koppel v. 4987 Corp., 167 F.3d 125, 131 (2d Cir. 1999).  Additionally, the Private Securities Litigation Reform Act requires that plaintiffs "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

---

[10] As noted above, plaintiffs assert all claims against Director Defendants except for the Count IV state law insider trading claim, which is asserted against Wilson and Day only.

21

The basis for plaintiffs' Section 14(a) claim is that the statements in the 2013 Proxy were "false and misleading" when they were made because they "facilitated Defendant Wilson's re-election to the Board" by not disclosing "internal turmoil at Lululemon that would result in Defendant Day either stepping down or being effectively fired after the close of business on June 10, 2013." (Am. Compl. ¶ 236.)

As described in Section I.D infra, the 2013 Proxy, as excerpted in the Amended Complaint, contains two paragraphs related Day and Wilson. The 2013 Proxy contains factual statements about Day's history with the company, her prior work history, her service on other boards of directors, and her educational background. (Id. ¶ 204.) It further states that Day was selected as a director because of this extensive experience. (Id.) With respect to Wilson, the 2013 Proxy states that Wilson is the Chairman of the Board, and that the Board "believes that Mr. Wilson, as the founder of lululemon, is in a unique position to support continuity in both the product vision and the cultural values of our company that have been an integral part of our success, and his role as Chairman of the Board enables him to be more effective in this role." (Id.)

Plaintiffs fail to allege that any of the assertions in the 2013 Proxy contained material misrepresentations or omissions when made. Plaintiffs do not allege that any of the factual statements about Day and Wilson were inaccurate. Further, plaintiffs do not allege particularized facts that indicate the Director Defendants did not believe that Day was selected as a director because of her experience, or did not believe that Wilson was not in the "unique position" so described. This is due,

in large part, to the fact that plaintiffs allege no particularized facts that any of the

Director Defendants had knowledge or believed that Day's resignation was

"imminent," or that she would announce her resignation in June 2013, as of April

30, 2013. The failure to disclose unspecified "internal turmoil" in the 2013 Proxy

thus does not constitute an actionable omission. The allegations in the Amended

Complaint thus fail to create a substantial likelihood of liability as to any of the

Director Defendants under Section 14(a) as a result of the 2013 Proxy.

        2.     Breach of Fiduciary Duty: Disclosure Violations (Count I)

      To the extent plaintiffs allege that the Director Defendants face a substantial

likelihood of liability with respect to state law disclosure violations for other false

and misleading statements not made in connection with a request for shareholder

action, plaintiffs must allege that the Director Defendants deliberately misinformed

shareholders or knowingly disseminated false information. See In re Nine Sys.

Corp. S'holders Litig., Consol. C.A. No. 3940-VCN, 2013 WL 771897, at *9 (Del. Ch.

Feb. 29, 2013); Citigroup, 964 A.2d at 132 (quoting Malone v. Brincat, 722 A.2d 5,

14 (Del. 1998)). Plaintiffs fail to do so for any of the Director Defendants with the

required particularity. At most, the Amended Complaint alleges that the Director

Defendants "caused" or "filed" certain financial reports with the SEC, or issued

certain press releases, that include statements as to the quality of lululemon's

products. (See Am. Compl. ¶¶ 145, 149, 157, 161-64, 172-73.) Nevertheless, as

defendants note, (1) the execution of "financial reports, without more, is insufficient

to create an inference that the directors had actual or constructive notice of any

23

illegality," Wood, 953 A.2d at 142; and (2) as is discussed in Section III.A, supra,

plaintiffs fail to allege any particularized facts suggesting that the Director

Defendants prepared or were directly responsible for these statements such that

demand would be excused.

        3.    Breach of Fiduciary Duty: Failure to "Maintain Internal
            Controls" (Count II)

Plaintiffs allege that the Director Defendants face a substantial likelihood of

liability with respect to Count II because they "willfully ignored the obvious and

pervasive problems with Lululemon's internal control practices and procedures and

failed to make a good faith effort to correct the problems or prevent their

recurrence." (Am. Compl. ¶ 215.) Plaintiffs expressly disclaim that either Count II

or the other Counts in the Amended Complaint allege a duty of care claim based on

In re Caremark International Derivative Litigation, 698 A.2d 959 (Del. Ch. 1996).

(See Opp. at 22 n.19.)[11]

Plaintiffs argue that the factual basis for this claim is three "widely

publicized 'red flags': (1) in 2007 . . . the Company was forced to withdraw claims

that its clothing incorporating seaweed fiber provided health benefits ([Am. Compl.]

¶¶ 186-88); (2) in December 2010, it was revealed that the Company . . . had

---

[11] To the extent any such claim is embedded in Count II or any of the other Counts, the Court finds
that it also does not serve as a basis to excuse demand. Lululemon's shareholders have adopted an
amendment to the company's certificate incorporation which, inter alia, eliminates director liability
"[t]o the fullest extent permitted" by Delaware law (Allerhand Decl. Ex. A, Art. IX, § 9.1, ECF No.
23), which, under Del. Code Ann. tit. 8, § 102(b)(7), "authorizes Delaware corporations . . . to
exculpate their directors from monetary damage liability for a breach of the duty of care." In re Walt
Disney Co. Derivative Litig., 906 A.2d 27, 65 (Del. 2006). Courts consider similar exculpatory
provisions to that contained in the lululemon certificate of incorporation in determining whether
plaintiffs have alleged facts showing a substantial likelihood of liability that would excuse demand.
See Wood, 953 A.2d at 141; Citigroup, 964 A.2d at 124-25.

24

shipped and distributed shopping bags that were printed using ink that contained high levels of lead ([id.] ¶¶ 189-90); and . . . (3) in late 2011, and early 2012, numerous Lululemon customers complained that Lululemon's garments were defective (including garments that contained luon) because their colors bled . . . or became sheer ([id.] ¶¶ 191-92)." (Opp. at 21.)

At most, these instances reflect three quality control issues faced by the company since 2007, two of which had nothing to do with luon pants. Plaintiffs fail, however, to allege what if anything the Director Defendants did or failed to do in response to these alleged red flags, including whether or not the Director Defendants consulted management or otherwise investigated these issues. See Citigroup, 964 A.2d at 128-29; see also La. Mun. Police Emps. Ret. Sys. v. Pandit, No. 08 Civ. 7389 (LTS), 2009 WL 2902587, at *8 (S.D.N.Y. Sept. 10, 2009). Accordingly, plaintiffs fail to allege with particularity a substantial likelihood of liability as to Count II as would excuse demand on the Director Defendants.[12]

> 4.    Claims Arising Out of Alleged Breaches of Fiduciary Duties (Counts III, V, and VI)

Plaintiffs' claims for unjust enrichment, abuse of control, and gross mismanagement against the Director Defendants are premised on the same alleged breaches of fiduciary duty described above (see Am. Compl. ¶¶ 218, 226, 231-33), and which the Court has found fail to create a substantial likelihood of liability for

---

[12] Plaintiffs also fail to plead particularized allegations giving rise to a substantial likelihood of liability as to any of the Director Defendants arising out of Wilson's June 2013 trading. See Section III.A, supra.

25

the Director Defendants so as to excuse demand.  Demand is thus also not excused on the basis of these claims.

## IV.    CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Amended Complaint pursuant to Rule 23.1 is GRANTED, because plaintiffs have failed to adequately allege particularized facts showing demand on lululemon's Board of Directors was excused.  The Court thus DISMISSES the complaint without prejudice, in the event plaintiffs seek to pursue these claims after making a demand on the Board.

Accordingly, the pending motions to intervene by the Laborers' District Council Construction Industry Pension Fund and the Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund are DENIED as moot.

The Clerk of Court is directed to close the motions at ECF Nos. 21, 36, and 43 in 13 Civ. 5629, and ECF Nos. 22, 37, and 44 in 13 Civ. 5977.  The Clerk of Court is also directed to close both actions.

SO ORDERED.

Dated:        New York, New York
              April _7_, 2014

                                              _____
                                              KATHERINE B. FORREST
                                              United States District Judge

26

**SPA-27**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THOMAS CANTY,

                    Plaintiff,         :       13 Civ. 5629 (KBF)

         -v-                 :         ORDER

CHRISTINE MCCORMICK DAY, et al.,

                 Defendants.    :

------------------------------------------------------------ X

TAMMY M. FEDERMAN,

                    Plaintiff,         :       13 Civ. 5977 (KBF)

         -v-                 :         ORDER

CHRISTINE MCCORMICK DAY, et al.,

                 Defendants.    :

------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      The Court provided the attached draft Opinion & Order to the parties on the morning of April 4, 2014, in advance of the conference that took place later that day.

      SO ORDERED.

Dated:     New York, New York
            April _9_, 2014

                                            KATHERINE B. FORREST
                                          United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: APR 0 9 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                        :
THOMAS CANTY,                                           :
                                                        :
                           Plaintiff,                   :        13 Civ. 5629 (KBF)
              -v-                                        :
                                                        :        **[DRAFT]**
                                                        :        OPINION & ORDER
CHRISTINE MCCORMICK DAY, et al.,                        :
                                                        :
                           Defendants.                  :
                                                        :
----------------------------------------------------- X
                                                        :
TAMMY M. FEDERMAN,                                      :
                                                        :
                           Plaintiff,                   :        13 Civ. 5977 (KBF)
              -v-                                        :
                                                        :        **[DRAFT]**
                                                        :        OPINION & ORDER
CHRISTINE MCCORMICK DAY, et al.,                        :
                                                        :
                           Defendants.                  :
                                                        :
----------------------------------------------------- X
KATHERINE B. FORREST, District Judge:

       Plaintiffs Thomas Canty and Tammy M. Federman bring these derivative

actions on behalf of nominal defendant lululemon athletica inc. ("lululemon" or the

"company") against thirteen current or former lululemon directors or executives for

violations of Section 14(a) of the Securities Exchange Act and Rule 14a-9

thereunder, as well as state law claims for breach of fiduciary duty, unjust

enrichment, abuse of control, and gross mismanagement, arising out of "serious

quality control problems" and "materially false and misleading statements" that

were made concerning those problems.  (See Am. Compl. ¶¶ 2, 209-238, ECF No.

20.)  Plaintiffs' claims center around lululemon's March 2013 recall of one of its

"flagship" products—its black luon yoga pants—and the events that followed,

including the announcement of the departure of lululemon's chief executive officer

("CEO") and stock sales by its founder and Chairman of the Board of Directors in

June 2013.  (See id. ¶¶ 15-34.)

Plaintiffs originally filed these actions on August 12 and 23, 2013,

respectively.  On October 3, 2013, these actions were transferred to the undersigned

and consolidated for pretrial purposes.[1]  In an order dated October 24, 2013, and as

discussed at the conference that day, the Court ordered plaintiffs to either file a

consolidated amended complaint or designate one of the two previously filed

complaints as the operative complaint.  (ECF No. 9.)[2]  On November 8, 2013,

plaintiffs designated the complaint in Canty v. Day et al., as the operative

complaint.  (ECF No. 11.)  Defendants thereafter moved to dismiss the operative

complaint on December 11, 2013 pursuant to Federal Rule of Civil Procedure 23.1.

(ECF Nos. 12-14.)  By letter dated December 18, 2013, plaintiffs requested leave to

file a consolidated amended complaint.  (ECF No. 15.)  The Court granted plaintiffs'

request, indicating that it expects to rule on the pleadings only once.  (ECF No. 18.)

Plaintiffs thereafter filed a consolidated amended complaint on January 17,

2014.  Defendants again moved to dismiss pursuant to Rule 23.1 on January 31,

2014, and the motion became fully briefed on February 21, 2014.

---

[1] Also pending before this Court is the related securities class action litigation, In re Lululemon
Securities Litigation, 13 Civ. 4596 (KBF), which involves many of the same facts and allegations as
are at issue in these actions.
[2] Unless otherwise specified, all ECF references in this Opinion are to the docket in Canty v. Day et
al., 13 Civ. 5629 (KBF).

For the reasons set forth below, defendants' motion is GRANTED and these actions are DISMISSED in the manner described below.

I.    FACTS

    A.    The Parties

Plaintiffs Canty and Federman have been holders of lululemon stock since June 2011 and May 2010, respectively.  (Am. Compl. ¶¶ 46, 47.)

Defendants Robert Bensoussan, Michael Casey, RoAnn Costin, Christine McCormick Day, William Glenn, Martha A.M. Morfitt, Rhoda M. Pitcher, Thomas S. Sternberg, Jerry Strizke, Emily White, and Dennis J. Wilson (collectively, with the exception of Day and Wilson, the "Director Defendants") served as lululemon's Board of Directors on the date the instant actions were filed.  (Id. ¶¶ 49-50, 53-61.) Director Defendants Casey, Morfitt, Glenn, and White served on the Board's Audit Committee during the "Relevant Period" (which is defined as 2012 to present).  (Id. ¶¶ 1, 53, 54, 57, 61, 63.)  Director Defendants Bensoussan, Casey, Pitcher, and Sternberg served on the Board's Nominating and Governance Committee during the Relevant Period.  (Id. ¶¶ 54, 55, 58, 59, 64.)

Day served as lululemon's CEO from July 2008 until January 2014.  (Id. ¶ 49.)  Day's resignation was announced in June 2013, but she remained with lululemon until her successor officially took over as CEO in January 2014.  (Id.)

Wilson is lululemon's founder, and has been a member of the board and the company's largest individual shareholder since 1998.  (Id. ¶ 50.)  Wilson has served as Chairman of the Board since 1998, but announced in December 2013 that,

although he will remain on the board, he intends to resign as Chairman shortly before lululemon's annual meeting in June 2014. (Id.) In the company's most recent Annual Report on Form 10-K filed on March 21, 2013, defendants acknowledge that Wilson "controls a significant percentage of our stock and is able to exercise significant influence over our affairs," and that he "is able to influence or control . . . the election of directors." (Id.)

Defendant John E. Currie has served as an Executive Vice President ("EVP") and CFO at lululemon since January 2007. (Id. ¶ 51.) Defendant Sheree Waterson served as Chief Product Officer until April 15, 2013, and previously served as EVP, General Merchandise Management and Sourcing beginning in June 2008. (Id. ¶ 52.) Neither Currie nor Waterson are alleged to be or to have been directors.

B.     Lululemon

Nominal defendant lululemon is a Delaware corporation with its principal executive offices in Vancouver, British Columbia. (Id. ¶¶ 1, 48.)

Lululemon designs and sells premium athletic apparel and accessories, including yoga pants, shorts, and tops. (Id. ¶ 3.) Lululemon's business model involves selling garments at high prices (approximately $100 per pair of pants and $60 per shirt) based upon their purported high quality, offering minimal discounts, and maintaining low store inventory to drive demand. (Id. ¶¶ 3, 70, 142.) Lululemon's most important and popular products are women's fitness pants designed from a proprietary material known as "luon." (Id. ¶ 71.)

During Day's tenure as CEO, the Company's apparel sales led to enormous growth. (Id. ¶ 83.) In just a few short years, from 2009 to 2012, lululemon quadrupled annual revenues to $1.37 billion, quadrupled gross profits to $763 million, and more than doubled its number of stores to over 200. (Id.) Fueled by strong financial results, lululemon's stock price increased dramatically, from approximately $4 per share at the beginning of 2009 to approximately $70 per share at the end of 2012. (Id. ¶ 85.) Black-colored luon products, a significant driver of sales, contributed substantially to this success. (Id.)

C.    The Alleged Wrongdoing

Plaintiffs allege failures to disclose defects in black luon used in lululemon yoga pants, internal control issues alleged to have led to these product defects, and an alleged "imminent" departure of Day from lululemon. (Id. ¶¶ 19, 20, 23, 33, 34, 36, 95, 143-81.)

Plaintiffs allege that defendants were aware of certain "red flags" concerning quality control issues at lululemon. Specifically, in November 2007, The New York Times revealed that the Company's "Vitasea" line of seaweed fabric—which lululemon claimed released "marine amino acids, minerals, and vitamins into the skin"—in fact contained no seaweed at all. (Id. ¶¶ 7, 90.) Lululemon was forced to apologize for and withdraw its prior claims of the line's health benefits and Wilson was forced to concede that in fact no tests had been conducted to confirm the veracity of these claims. (Id. ¶¶ 90, 91.) In December 2010, it was revealed that the company shipped and distributed reusable shopping bags that had been printed

5

using ink containing high levels of lead.  (Id. ¶¶ 8, 94.)  In late 2011 and 2012, many customers complained that luon garments "bled" when used during exercise, or when it came into contact with sweat or water.  (Id. ¶¶ 9-10, 96, 100.)

In February and March 2013, customers began reporting that certain brightly colored luon pant fabrics were sheer when worn.  (Id. ¶ 106.)  Lululemon initially offered a disclaimer with these products as to their "sheerness."  (Id.) Ultimately, however, following the close of trading on March 18, 2013, lululemon announced a recall of these pants and offered refunds for all affected products.  (Id. ¶ 107.)  This resulted in a reduction in the company's revenue guidance for the first quarter of 2013 by approximately $20 million, or 5%, from $350-$355 million to $333-$343 million.  (Id.)  The company announced three days later that lululemon expected to lose $57-$67 million in revenue and $0.25-$0.27 in earnings per share ("EPS") during the 2013 fiscal year due to the recall.  (Id.)

Day's resignation from lululemon was announced in an earnings press release on June 10, 2013.  (Id. ¶ 129.)  Media reports suggested that her departure was tied to the black luon recall.  (Id. ¶¶ 130, 131.)

According to news reports in October 2013, lululemon continued to receive additional complaints about the transparency of its yoga pants following the recall, as well as "pilling"—small balls of fabric accumulating on the surface of the product. (Id. ¶ 133.)  On December 12, 2013, lululemon announced a $30 million cut to earnings guidance for the fourth quarter of 2013, or nearly 5%.  (Id. ¶ 138.)  On January 13, 2014, the company revised its fourth quarter 2013 revenue and EPS

projections downward due to a "meaningful" drop in sales attributed to quality control failures and related events.  (Id. ¶ 177.)

Over a six-month span during the Relevant Period, Wilson sold almost 2.3 million lululemon shares for proceeds of over $184 million.  (Id. ¶ 194.)  Plaintffs challenge Wilson's trades from June 4-7, 2013 as suspicious based on the timing of the announcement of Day's resignation on June 10, 2013.  On June 7, 2013, the full Board was formally informed that Day would resign as CEO.  (Id. ¶ 168.)  The same day, Wilson sold 607,545 lululemon shares for proceeds of nearly $50 million.  (Id. ¶ 196.)  This was the largest single day sale he ever made.  (Id. ¶ 197.)  All told, between June 4 and June 7, 2013, Wilson sold one million lululemon shares for proceeds totaling $81 million at stock prices near lululemon's all-time high.  (Id.)  These sales constituted more than half of all of his sales during the Relevant Period.  (Id. ¶ 197.)  Lululemon's stock price fell by 22% following the announcement of Day's resignation.  (Id. ¶ 171.)

During the Relevant Period, Day sold 196,043 shares of lululemon stock for over $14 million.  (Id. ¶ 200.)  Plaintiffs allege that Day capitalized on spikes in the stock price in September 2012, December 2012, and September 2013 following statements she issued concerning the company's quality assurance issues.  (Id. ¶¶ 201-203.)

D.    <u>April 30, 2013 Proxy Statement</u>

Plaintiffs alleged that, April 30, 2013, "Defendants"[3] caused lululemon to disseminate the a proxy statement (the "2013 Proxy") to shareholders in connection with the company's annual shareholder meeting. (<u>Id.</u> ¶ 204.) Plaintiffs allege that "Defendants drafted, approved, reviewed and/or signed the 2013 Proxy before it was filed with the SEC and disseminated to Lululemon shareholders." (<u>Id.</u>) Plaintiffs allege that "Defendants knew, or were deliberately reckless in not knowing, that the 2013 Proxy was materially false and misleading." (<u>Id.</u>)

The two pieces of the 2013 Proxy that are excerpted in the Amended Complaint concern defendants Day and Wilson. With respect to Day, the 2013 Proxy describes her history with the company, her prior work history, her service on other boards of directors, and her educational background. (<u>Id.</u>) The 2013 Proxy states: "Our board of directors selected Ms. Day to serve as director because she is our Chief Executive Officer and she has extensive experience in sales and marketing, managing retail focused operations, international operations, corporate finance and strategic planning." (<u>Id.</u>)

With respect to Wilson, the 2013 Proxy notes that Wilson's current position is Chairman of the Board. (<u>Id.</u>) The 2013 Proxy states: "Our board of directors believes that Mr. Wilson, as the founder of lululemon, is in a unique position to support continuity in both the product vision and the cultural values of our company that have been an integral part of our success, and his role as Chairman of the Board enables him to be more effective in this role." (<u>Id.</u>)

---

[3] Plaintiffs use the term "Defendants" to refer to all thirteen defendants in both actions.

8

II.    LEGAL STANDARDS

A.    Rule 23.1 Pleading Requirements

Federal Rule of Civil Procedure 23.1 requires that a plaintiff in a shareholder

derivative action "state with particularity . . . any effort by the plaintiff to obtain

the desired actions from the directors . . . and . . . the reasons for not obtaining the

action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).  This rule sets forth a

"rule of pleading" as to "the specificity of facts alleged with regard to efforts made to

urge a corporation's directors to bring the action in question, but the adequacy of

those efforts is to be determined by state law absent a finding that application of

state law would be inconsistent with a federal policy underlying a federal claim in

the action." Halebian v. Berv, 590 F.3d 195, 206 n.7 (2d Cir. 2009) (internal

quotation marks and citation omitted).  It is undisputed that lululemon is a

Delaware corporation and that Delaware law thus governs. See Scalisi v. Fund

Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004).

"'In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1

motion to dismiss for failure to make a demand is not intended to test the legal

sufficiency of the plaintiffs' substantive claim.  Rather, its purpose is to determine

who is entitled, as between the corporation and its shareholders, to assert the

plaintiff's underlying substantive claim on the corporation's behalf.'" In re SAIC

Inc. Derivative Litig., 948 F. Supp. 2d 366, 376 (S.D.N.Y. 2013) (citation omitted).

"'Because Rule 23.1 requires that plaintiffs make particularized allegations, it

imposes a pleading standard higher than the normal standard applicable to the

9

analysis of a pleading challenged under Rule 12(b)(6).'" In re Am. Int'l Grp., Inc.

Derivative Litig., 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010), aff'd, 415 F. App'x 285

(2d Cir. 2011) (citation omitted).

        B.    The Demand Requirement

    Derivative suits permit "an individual shareholder to bring 'suit to enforce a

corporate cause of action against officers, directors, and third parties.'" Kamen v.

Kemper Fin. Servs., 500 U.S. 90, 95 (1991) (citing Ross v. Bernhard, 396 U.S. 531,

534, (1970)) (emphasis in original).

    Under Delaware law, "[a] stockholder may not pursue a derivative suit to

assert a claim of the corporation unless the stockholder: (a) has first demanded that

the directors pursue the corporate claim and the directors have wrongfully refused

to do so; or (b) establishes that pre-suit demand is excused because the directors are

deemed incapable of making an impartial decision regarding the pursuit of the

litigation." Wood v. Baum, 953 A.2d 136, 140 (Del. 2008). "[T]he demand

requirement implements 'the basic principle of corporate governance that the

decisions of a corporation—including the decision to initiate litigation—should be

made by the board of directors or the majority of shareholders.'" Kamen, 500 U.S.

at 101 (citation omitted). "[T]he demand requirement is a recognition of the

fundamental precept that directors manage the business and affairs of

corporations." Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984).

    "The purpose of the demand requirement is to affor[d] the directors an

opportunity to exercise their reasonable business judgment and waive a legal right

**SPA-38**

vested in the corporation in the belief that its best interests will be promoted by not

insisting on such right." Kamen, 500 U.S. at 96 (internal quotation marks and

citations omitted). In short, "[t]he purpose of requiring a precomplaint demand is to

protect the directors' prerogative to take over the litigation or to oppose it." Id. at

101. "A board may in good faith refuse a shareholder demand to begin litigation

even if there is substantial basis to conclude that the lawsuit would eventually be

successful on the merits. It is within the bounds of business judgment to conclude

that a lawsuit, even if legitimate, would be excessively costly to the corporation or

harm its long-term strategic interests." In re InfoUSA, Inc. S'holders Litig., 953

A.2d 963, 986 (Del. Ch. 2007). These interests are particularly relevant where, as

here, a shareholder derivative action seeks recovery on the basis of the same

allegations alleged against the company in a federal securities class action also

pending before this Court.[4] See South v. Baker, 62 A.3d 1, 25 (Del. Ch. 2012)

(noting that the pursuit of a derivative action during the pendency of other related

litigation against the corporation "may well compromise the corporation's position

on the merits, thereby causing or exacerbating precisely the harm that the . . .

plaintiff ostensibly seeks to remedy").

---

[4] As is described in detail in defendants' opening brief, the allegations in the Consolidated Amended Complaint are not only related to those currently being advanced by lead plaintiffs in In re Lululemon Securities Litigation, 13 Civ. 4596 (KBF), they are in many instances copied verbatim or with minimal conforming changes from the operative complaint in that action. (See Mem. of Law at 7-8, ECF No. 22.) This dramatic degree of overlap further heightens the importance of the demand requirement for bringing a derivative action as applied to the facts and circumstances of the instant actions.

C.    When Demand Is Excused

Under Delaware law, demand is not required if the facts pled show that such a demand would have been futile. Aronson, 473 A.2d at 808. Demand is futile when, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Id. at 814. In cases where plaintiffs allege that board inaction, rather than board action, renders demand futile, courts focus on the first prong of the Aronson test. In such cases, courts must determine whether the "particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993); see also Wood, 953 A.2d at 140 (describing situations in which to apply the Aronson and Rales tests).

In light of the allegations in the complaint and the arguments provided in opposition to the instant motions—that the Defendant Directors caused, allowed, or permitted lululemon to disseminate false and misleading information, failed to maintain internal controls, and failed to take action as to Wilson's June 2013 stock sales[5] (see Am. Compl. ¶¶ 208(b)-(f); Opp. at 17-22, ECF No. 24)—there can be no

---

[5] Though plaintiffs argue that the Defendant Directors "facilitated" Wilson's June 2013 stock sales, the manner of facilitation they allege is failing to act so as to stop Wilson from executing those sales. (Opp. at 17-18.) Plaintiffs do not allege that lululemon's directors made a decision to make false or misleading statements or to fail to maintain internal controls, so "the subject of the derivative suit is not a business decision of the board." Rales, 634 A.2d at 934.

dispute that the allegations in these actions implicate the Rales test for demand futility concerning board inaction.

The reasonable doubt standard "can be said to mean that there is a reason to doubt"—"[t]his concept is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." Grimes v. Donald, 673 A.2d 1207, 1217 (Del. 1996). Though the reasonable doubt standard does not require plaintiffs to demonstrate a reasonable probability of success on the merits, see Rales, 634 A.2d at 934, it does not water down the pleading threshold requiring that reasonable doubt be pled with particularized facts sufficient to overcome the presumption that directors are "faithful to their fiduciary duties." Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d at 1050 n.26, 1048-49 (Del. 2004). Courts "draw all reasonable inferences in the plaintiff's favor," but only if they "logically flow from particularized facts alleged by the plaintiff." Wood, 953 A.2d at 140 (quoting Beam, 845 A.2d at 1048).

Plaintiffs seeking to allege such reasonable doubt may allege particularized facts that "show that a given director is personally interested in the outcome of the litigation, in that the director will personally benefit or suffer as a result of the lawsuit." InfoUSA, 953 A.2d at 985. Plaintiffs may also allege reasonable doubt by demonstrating that a director is subject to a "substantial likelihood of liability." Ryan v. Gifford, 918 A.2d 341, 355 (Del. Ch. 2007) (internal quotation marks and citation omitted). A "'mere threat of personal liability . . . is insufficient to challenge

either the independence or disinterestedness of directors'" in order to excuse

demand. Wood, 953 A.2d at 141 n.11 (quoting Aronson, 473 A.2d at 815). "Without

a substantial threat of director liability, a court has no reason to doubt the board's

ability to address the corporate trauma and evaluate a related demand." South, 62

A.3d at 14. "A simple allegation of potential directorial liability is insufficient to

excuse demand, else the demand requirement itself would be rendered toothless,

and directorial control over corporate litigation would be lost." In re Goldman Sachs

Grp., Inc. S'holder Litig., Civil Action No. 5215—VCG, 2011 WL 4826104, at *18

(Del. Ch. Oct. 12, 2011).

"[A] derivative complaint must plead facts specific to each director,

demonstrating that at least half of them could not have exercised disinterested

business judgment in responding to a demand." Desimone v. Barrows, 924 A.2d

908, 943 (Del. Ch. 2007); see Blaustein v. Lord Baltimore Capital Corp., C.A. No.

6685–VCN, 2014 WL 240628, at *3 (Del. Jan. 21, 2014) ("[A] plaintiff must allege

with particularity that a majority of the board lacks independence or is otherwise

incapable of validly exercising its business judgment."). The "'group' accusation

mode of pleading demand futility" is insufficient. In re Citigroup Inc. S'holder

Derivative Litig., 964 A.2d 106, 121 n.36 (Del. Ch. 2009); see In re ITT Corp.

Derivative Litig., 588 F. Supp. 2d 502, 511 (S.D.N.Y. 2008) ("Whether the Directors

face a substantial likelihood of liability must be determined on a director-by-

director basis, and thus Plaintiffs' conflation of all the directors into a single entity

is insufficient under Rule 23.1.").

In sum, alleging that demand is excused is "a difficult feat."  Ryan, 918 A.2d at 352 n.23 (Del. Ch. 2007).  "[C]onsistent with the long-standing principle that directors and not shareholders manage a corporation, the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare."  Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines, 534 F.3d 779, 782-83 (D.C. Cir. 2008).

III.  DISCUSSION

In the Amended Complaint, plaintiffs allege one federal claim in Count VII—that one of the alleged false or misleading statements violated Section 14(a) and Rule 14a-9 thereunder because it was made in the 2013 Proxy.  Plaintiffs allege two sets of Delaware state law claims: (1) breach of fiduciary duty for (i) disclosure violations (Count I), (ii) failures to maintain internal controls (Count II), and (iii) insider trading (Count IV), and (2) claims arising out of the alleged breaches of fiduciary duty: (i) unjust enrichment (Count III), (ii) abuse of control (Count V), and (iii) gross mismanagement (Count VI).  All of plaintiffs' claims are asserted against all defendants except the Count IV insider trading claim, which is alleged against defendants Wilson and Day only.

Plaintiffs concede that no demand to institute these actions was made on the Board of Directors; instead, plaintiffs allege demand is futile and excused.  (Am. Compl. ¶ 208.)  Plaintiffs further concede that, because the Board consisted of the eleven Director Defendants at the time these actions were initiated (id. ¶ 208), plaintiffs must raise a reasonable doubt as to the disinterestedness or independence

of six Director Defendants in order to adequately plead demand futility.[6]  (Opp. at 12.)  Even assuming, without deciding, demand is excused as to Director Defendants Wilson and Day, plaintiffs fail to allege the kind of particularized allegations required by Rule 23.1 and Delaware law as to <u>any</u> (let alone four) Director Defendants.

Plaintiffs argue that demand is excused as to all Director Defendants for two sets of reasons: (A) that the Director Defendants' "conscious inaction in the face of Wilson's illicit trading is the result of a lack of independence and domination of Wilson over the Board" (Opp. at 18); and (B) that the Director Defendants' face a substantial likelihood of liability because they consciously or recklessly disregarded "red flags" concerning lululemon's quality control issues (<u>id.</u> at 20.)

These arguments are without merit.

A.    <u>Control and Domination by Wilson</u>

Plaintiffs argue that their particularized allegations in the Amended Complaint as to Wilson's stock sales, their timing, and the Board's knowledge of Day's impending departure, coupled with Wilson's control and influence over the Board more generally, are sufficient to plead demand futility as to all Director Defendants.  (<u>Id.</u> at 18-19.)  As the argument goes, "the only reasonable, common sense, pragmatic inference fairly drawn from the facts is that the Board cannot act independently or with disinterest here."  (<u>Id.</u> at 19.)

---

[6] Non-Director Defendants Currie and Waterson are not relevant to determining whether demand is futile.  <u>See</u> <u>In re Forest Labs., Inc. Derivative Litig.</u>, 450 F. Supp. 2d 379, 381 (S.D.N.Y. 2006).

16

The Court disagrees.  Under Delaware law, plaintiffs "must plead facts that would support the inference that because of the nature of a relationship or additional circumstances . . . the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." Beam, 845 A.2d at 1052.  Whether plaintiffs have pled sufficient facts must be resolved on a director-by-director basis through an analysis of the particularized factual allegations.  Khanna v. McMinn, No. Civ. A. 20545–NC, 2006 WL 1388744, at *15 (Del. Ch. May 9, 2006).

The allegations in the Amended Complaint fall far short of this standard.  Plaintiffs fail to plead particularized allegations as to the disinterestedness or independence of any of the Director Defendants as it relates to Wilson.  Plaintiffs rely on their allegations concerning Wilson's alleged insider trading in advance of Day's resignation announcement on June 10, 2013.  Though plaintiffs allege that the Director Defendants knew of Day's resignation no later than June 7, 2013 (see Am. Compl. ¶ 198), they do not allege any facts as to their knowledge of Wilson's trading during the period June 4-7, 2013.  Plaintiffs fail to allege any facts that show Wilson's trades were inconsistent with his Rule 10b5-1 trading plan (see id. ¶ 32), or, importantly, that any of the Director Defendants knew it.  Plaintiffs also fail to allege that either of the two "third-party transactions" involving Wilson that were previously approved by the Director Defendants were unfair to lululemon.

Similarly, plaintiffs fail to allege particularized facts that tend to show Wilson controlled and dominated the Director Defendants because they supposedly

17

"facilitated" Wilson's re-election to the Board by not disclosing "internal turmoil" at lululemon. (Opp. at 18-19; Am. Compl. ¶ 236.) As is discussed in Section III.B.1, infra, plaintiffs fail to allege that the 2013 Proxy associated with this election was materially false or misleading. Plaintiffs also fail to allege any particularized facts that the Director Defendants prepared or were directly responsible for these disclosures; in fact, the general allegations that the Director Defendants caused or allowed lululemon to issue certain statements (see Am Compl. ¶ 211) are the kind of allegations that courts often find insufficient for the purpose of excusing demand.[7] See Citigroup, 964 A.2d at 133 n.88, 134; see also In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig., No. 11 Civ. 4544 (WHP), 2012 WL 3293506, at *9 (S.D.N.Y. Aug. 14, 2012) (citing Citigroup, 964 A.2d at 132-34).

In sum, plaintiffs' allegations concerning Wilson's stock sales, as they relate to the Director Defendants, are general and conclusory rather than factual and specific, and thus fail to overcome the presumption of directorial independence and to excuse demand.

   B.    Substantial Likelihood of Liability

Plaintiffs next argue, in substance, that the Director Defendants face a substantial likelihood of liability, so as to excuse demand, because they were on notice of red flags concerning quality control issues at lululemon and failed to act in order to correct them. (Opp. at 20-22.) This argument, viewed in context of each of

---

[7] The Court notes that plaintiffs do not respond to this argument in their opposition papers in any meaningful way.

18

the claims alleged in the Amended Complaint against the Director Defendants,[8] is without merit.  Plaintiffs fail to allege a substantial likelihood of liability for any of the Director Defendants as to any of these claims such that demand is excused.

        1.      Section 14(a) of the Securities Exchange Act (Count VII)

Liability under Section 14(a) and Rule 14a-9 thereunder requires, inter alia, a materially false or misleading statement in a proxy statement.  See 17 C.F.R. § 240.14a-9 ("[n]o solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which . . . is false or misleading"); In re J.P. Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (requiring "a material misrepresentation or omission"); see also Koppel v. 4987 Corp., 167 F.3d 125, 131 (2d Cir. 1999).  Additionally, the Private Securities Litigation Reform Act requires that plaintiffs "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

The basis for plaintiffs' Section 14(a) claim is that these statements were "false and misleading" when they were made because they "facilitated Defendant Wilson's re-election to the Board" by not disclosing "internal turmoil at Lululemon that would result in Defendant Day either stepping down or being effectively fired after the close of business on June 10, 2013."  (Id. ¶ 236.)

---

[8] As noted above, plaintiffs assert all claims against Director Defendants except for the Count IV Delaware state law insider trading claim, which is asserted against Wilson and Day only.

19

As described in Section I.D <u>infra</u>, the 2013 Proxy, as excerpted in the Amended Complaint, contains two paragraphs related Day and Wilson. The 2013 Proxy contains factual statements about Day's history with the company, her prior work history, her service on other boards of directors, and her educational background. (Am. Compl. ¶ 204.) It further states that Day was selected as a director because of this extensive experience. (<u>Id.</u>) With respect to Wilson, the 2013 Proxy states that Wilson is the Chairman of the Board, and that the Board "believes that Mr. Wilson, as the founder of lululemon, is in a unique position to support continuity in both the product vision and the cultural values of our company that have been an integral part of our success, and his role as Chairman of the Board enables him to be more effective in this role." (<u>Id.</u>)

Plaintiffs fail to properly allege that any of the assertions in the 2013 Proxy contained material misrepresentations or omissions when made. Plaintiffs do not allege that any of the factual statements about Day and Wilson were inaccurate. Plaintiffs do not allege particularized facts that indicate the Director Defendants did not believe that Day was selected as a director because of her experience, or did not believe that Wilson was not in the "unique position" so described. This is due, in large part, to the fact that plaintiffs allege no particularized facts that any of the Director Defendants had knowledge of the fact that Day would announce her resignation in June 2013 as of April 30, 2013. Plaintiffs' Section 14(a) claim thus fails to create a substantial likelihood of liability as to any of the Director Defendants.

2.      Breach of Fiduciary Duty: Disclosure Violations (Count I)

To the extent plaintiffs allege that the Director Defendants face a substantial

likelihood of liability with respect to state law disclosure violations for other false

and misleading statements not made in connection with a request for shareholder

action, plaintiffs must allege that the Director Defendants deliberately misinformed

shareholders or knowingly disseminated false information.  See In re Nine Sys.

Corp. S'holders Litig., Consol. C.A. No. 3940–VCN, 2013 WL 771897, at *9 (Del. Ch.

Feb. 29, 2013); Citigroup, 964 A.2d at 132 (quoting Malone v. Brincat, 722 A.2d 5,

14 (Del. 1998)).  Plaintiffs fail to do so for any of the Director Defendants with the

required particularity.  At most, the Amended Complaint alleges that the Director

Defendants "caused" or "filed" certain financial reports with the SEC, or issued

certain press releases, that include statements as to the quality of lululemon's

products.  (See Am. Compl. ¶¶ 145, 149, 157, 161-64, 172-73.)  Nevertheless, as

defendants note (1) the execution of "financial reports, without more, is insufficient

to create an inference that the directors had actual or constructive notice of any

illegality," Wood, 953 A.2d at 142; and (2) as is discussed in Section III.A, supra,

plaintiffs fail to allege any particularized facts suggesting that the Director

Defendants prepared or were directly responsible for these statements such that

demand would be excused.

3.      Breach of Fiduciary Duty: Failure to "Maintain Internal
        Controls" (Count II)

Plaintiffs allege that the Director Defendants face a substantial likelihood of

liability with respect to Count II because they "willfully ignored the obvious and

21

**SPA-49**

pervasive problems with Lululemon's internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence." (Am. Compl. ¶ 215.)  Plaintiffs expressly disclaim that either Count II or the other Counts in the Amended Complaint allege a duty of care claim based on In re Caremark International Derivative Litigation, 698 A.2d 959 (Del. Ch. 1996). (See Opp. at 22 n.19.)[9]

Plaintiffs argue that the factual basis for this claim is three "widely publicized 'red flags': (1) in 2007 . . . the Company was forced to withdraw claims that its clothing incorporating seaweed fiber provided health benefits ([Am. Compl.] ¶¶ 186-88); (2) in December 2010, it was revealed that the Company . . . had shipped and distributed shopping bags that were printed using ink that contained high levels of lead ([id.] ¶¶ 189-90); and . . . (3) in late 2011, and early 2012, numerous Lululemon customers complained that Lululemon's garments were defective (including garments that contained luon) because their colors bled . . . or became sheer ([id.] ¶¶ 191-92)." (Opp. at 21.)

At most, these instances reflect three quality control issues faced by the company since 2007, two of which had nothing to do with luon pants.  Plaintiffs fail, however, to allege what if anything the Director Defendants did or failed to do in

---

[9] To the extent any such claim is embedded in Count II or any of the other Counts, the Court finds that it also does not serve as a basis to excuse demand. Lululemon's shareholders have adopted an amendment to the company's certificate incorporation which, inter alia, eliminates director liability "[t]o the fullest extent permitted" by Delaware law (Allerhand Decl. Ex. A, Art. IX, § 9.1, ECF No. 23), which, under Del. Code Ann. tit. 8, § 102(b)(7), "authorizes Delaware corporations . . . to exculpate their directors from monetary damage liability for a breach of the duty of care." In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 65 (Del. 2006).  Courts consider similar exculpatory provisions to that contained in the lululemon certificate of incorporation in determining whether plaintiffs have alleged facts showing a substantial likelihood of liability that would excuse demand. See Wood, 953 A.2d at 141; Citigroup, 964 A.2d at 124-25.

response to these alleged red flags, including whether or not the Director

Defendants consulted management or otherwise investigated these issues.  See

Citigroup, 964 A.2d at 128-29; see also La. Mun. Police Emps. Ret. Sys. v. Pandit,

No. 08 Civ. 7389 (LTS), 2009 WL 2902587, at *8 (S.D.N.Y. Sept. 10, 2009).

Accordingly, plaintiffs fail to allege with particularity a substantial likelihood of

liability as to Count II as would excuse demand on the Director Defendants.

> 4.   Claims Arising Out of Alleged Breaches of Fiduciary Duties
>       (Counts III, V, and VI)

Plaintiffs' claims for unjust enrichment, abuse of control, and gross

mismanagement against the Director Defendants are premised on the same alleged

breaches of fiduciary duty described above (see Am. Compl. ¶¶ 218, 226, 231-33),

and which the Court has found failed to create a substantial likelihood of liability

for the Director Defendants so as to excuse demand.  Demand is thus also not

excused on the basis of these claims.

IV.   CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the

consolidated amended complaint pursuant to Rule 23.1 is GRANTED, because

plaintiffs have failed to adequately allege particularized facts showing demand on

lululemon's Board of Directors was excused.  The Court thus DISMISSES the

complaint without prejudice, in the event plaintiffs seek to pursue these claims

after making a demand on the Board.

Accordingly, the pending motions to intervene by the Laborers' District Council Construction Industry Pension Fund and the Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund are DENIED as moot.

The Clerk of Court is directed to close the motions at ECF Nos. 21, 36, and 43 in 13 Civ. 5629, and ECF Nos. 22, 37, and 44 in 13 Civ. 5977.  The Clerk of Court is also directed to close both actions.

SO ORDERED.

Dated:      New York, New York
            April ___, 2014

_____
KATHERINE B. FORREST
United States District Judge

# SPA-52

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED  4/25/2014
```

-------------------------------------------------------X

THOMAS CANTY,

                    Plaintiff,                        13 **CIVIL** 5629 (KBF)

        -against-                                   **JUDGMENT**

CHRISTINE MCCORMICK DAY, et al.,

                    Defendants.

-------------------------------------------------------X

TAMMY M. FEDERMAN,

                    Plaintiff,                        13 **CIVIL** 5977 (KBF)

        -against-                                   **JUDGMENT**

CHRISTINE MCCORMICK DAY, et al.,

                    Defendants.

-------------------------------------------------------X

      Whereas Defendants having moved to dismiss pursuant to Rule 23.1 on January 31, 2014, (Doc. # 21 in case number 13-cv-5629, and Doc. # 22 in case number 13-cv-5977), and the matter having come before the Honorable Katherine B. Forrest, United States District Judge, and the Court, thereafter, having issued its Opinion & Order (Doc. # 50) granting Defendants' motions to dismiss, dismissing these actions without prejudice, and directing the Clerk of Court to close both actions, it is:

      **ORDERED, ADJUDGED AND DECREED:** that for the reasons stated in the Court's Opinion & Order, dated April 9, 2014, defendants' motion to dismiss the Amended Complaint pursuant to Rule 23.1 is GRANTED, because plaintiffs have failed to adequately allege particularized facts showing demand on lululemon's Board of Directors was excused. The Court thus DISMISSES the complaint without prejudice, in the event plaintiffs seek to pursue these claims after making a demand on the Board; and the pending motions to intervene by the Laborers' District

Council Construction Industry Pension Fund and the Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund are DENIED as moot; accordingly, these cases are closed.


**DATED:**  New York, New York
          April 25, 2014

                                        **RUBY J. KRAJICK**
                              _____
                                        **Clerk of Court**

                        **BY:**   _____
                                        **Deputy Clerk**